Westlaw

49 SANCLR 313                                                                                          Page 1
49 Santa Clara L. Rev. 313

c

Santa Clara Law Review
2009

Article

**\*313** OMNIVEILLANCE, GOOGLE, PRIVACY IN PUBLIC, AND THE RIGHT TO YOUR DIGITAL IDEN-
TITY: A TORT FOR RECORDING AND DISSEMINATING AN INDIVIDUAL'S IMAGE OVER THE IN-
TERNET

Josh Blackman [FNa1]

Copyright (c) 2009 School of Law, Santa Clara University; Josh Blackman

INTRODUCTION

Photographing people in public places is nothing new.  Internet giant Google recently began photographing
American streets with a new technology entitled Google Street View. [FN1] But Google does not only record
streets. [FN2] Its high-resolution cameras are able to capture people, both outside, and inside of their homes
through open windows, engaged in private matters. [FN3] Those captured by Google's cameras are not even
aware they are being recorded, as Google uses nondescript recording equipment to clandestinely record people
in their natural state. [FN4] These images are then disseminated to users all over the world. [FN5] Although the
present iteration of this technology only displays previously recorded images, current privacy laws do not pre-
vent Google from implementing a system that broadcasts live video feeds **\*314** of street corners throughout
America. This threat is all the more real in light of projected trends in technology and the path of future Internet
developments. In the future, individuals could be able to visit Google's web site and search for a specific time,
date, and location. Users will thus be able to witness what happened at any place and to what people, at any mo-
ment in Google's recorded history. Such pervasive human monitoring is the essence of the phenomenon this art-
icle has termed omniveillance.

Omniveillance is a form of omnipresent and omniscient digital surveillance in public places that is broadcas-
ted indiscriminately throughout the Internet.  Due to the unselective nature of this technology, neither newswor-
thiness, nor a person's solitude, is of any concern.  The question thus arises--what limitations exist for private
entities to monitor individuals and broadcast their recordings throughout the Internet?

The two major privacy torts, public disclosure of private facts and intrusion upon seclusion, are concerned
with balancing privacy and free speech.  Yet, they are largely incapable of remedying the intrusiveness of emer-
ging omniveillance technologies.  The tort of public disclosure of private facts is restricted by a newsworthiness
exception that allows the reproduction of private facts as long as the information possesses a non-zero amount of
social content. [FN6] Under this test, almost anything can have some social value. The tort of intrusion upon se-
clusion prevents violating a person's solitude, but does not apply when a person is in public. [FN7] This tort is
impotent for anyone who is not barricaded in his home. Thus, under both of these torts, victims of omniveillance
are left without a remedy.

© 2010 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

When these torts were developed, the level of invasion into an individual's privacy was limited by photographers making a choice to photograph an individual at the opportunity cost of not photographing someone else. With new technology, the choice is no longer which individual to photograph, but which city to photograph in its entirety. Each individual could be not only indiscriminately photographed, but also persistently filmed, leading to a state **\*315** of constant monitoring. This is an undesirable state, and will only get worse as new technology develops. This article proposes the right to your digital identity through a tort that balances privacy rights with free speech and provides a remedy for victims of omniveillance.

In Part I, this article explores privacy, including the birth of privacy in America, modern privacy law, and how privacy can promote free speech and expression. This article does not focus on government surveillance or Fourth Amendment issues. In Part II, this article introduces and explains omniveillance, and the first potential omniveiller, Google Street View. Next, this section takes a journey into the not-so-distant future of omniveillance, where no privacy can exist in public. Cameras record everyone, everywhere, at anytime, and rebroadcast this information onto the Internet. Based on the inadequacy of current privacy protections to protect citizens from this looming threat, this section establishes the need for a tort to remedy the victims of omniveillance.

In Part III, this article proposes a new tort--the right to your digital identity. The tort has four factors that are balanced to create a workable equilibrium between privacy and free speech. This tort emerged from existing privacy torts, borrowing from many areas of the law to develop a viable framework to remedy victims of omniveillance. The first element of the tort results from a synergy of criminal law, paparazzi statutes, and voyeurism laws. This part modifies the tort of intrusion upon seclusion and adopts a reasonable expectation of privacy standard. The second element serves as a reflection on society's changing perceptions of offensiveness. It incorporates part of California's modern paparazzi statute [FN8] and modifies the tort of public disclosure of private facts, lowering the standard from highly offensive to offensive, in order to mirror contemporary sensibilities. The third element of the tort borrows from federal and state voyeurism statutes and modifies the tort of public disclosure of private facts. This section focuses on the new, more pervasive methods of electronic data dissemination over social networks and viral **\*316** Internet distributions, and accords greater liability to larger and more indiscriminate distributions. The fourth element weighs the newsworthiness exception from the tort of public disclosure of private facts against the level of intrusion into an individual's privacy. This element is distinguished from the test defined by the Supreme Court in Florida Star v. B.J.F., [FN9] which greatly weakened the public disclosure of privacy tort. [FN10] Following Florida Star, courts have found it difficult to find in favor of privacy. [FN11] This newly proposed newsworthiness test attempts to strike a balance so that privacy has a chance to outweigh free speech when applied in our courts. Enforced as a common-law tort, where each state can define the contours of the tort to meet its citizens' specific needs, the right to one's digital identity is a viable remedy for victims of omniveillance.

## I. Background

Privacy has a long and proud tradition in America, playing a critical role in promoting free speech and developing some of our most important institutions. [FN12] James Madison, Alexander Hamilton, and John Jay published the Federalist Papers under the pseudonym Publius. [FN13] Benjamin Franklin used more than forty pen names. [FN14] Secret balloting is one of the hallmarks of American democracy. [FN15] The Constitutional Convention of 1787 was conducted in absolute privacy. [FN16] Many of the framers acknowledged that without secrecy and privacy, the Constitution could not have been written for fear of retribution. [FN17] In the twenty years following **\*317** the drafting of the United States Constitution, six presidents, fifteen cabinet members,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

twenty senators, and thirty-four congressmen published political writings anonymously, advocating political beliefs that they chose not to publicly disclose. [FN18]

Scholars generally consider the seminal law review article The Right to Privacy [FN19] by Samuel Warren and future Supreme Court Justice Louis Brandeis as the first attempt to explain American privacy jurisprudence. [FN20] In his dissent to the landmark Florida Star decision, Justice White noted that the privacy torts derived from this article were "one of the most noteworthy legal inventions of the 20th century." [FN21] From its genesis, the right to privacy, as described by Warren and Brandeis, faced an uphill battle as a result of Dean Prosser's codification and limitation of these principles in the Restatement (Second) of Torts. In the decades since the Restatement, the privacy torts have gone into hibernation. However, with the proper understanding, they remain ready and able to protect privacy. This section will provide a brief exploration of the history of privacy, its subsequent decline, and establish how privacy can promote free speech and expression.

A. The Birth of Privacy in America

The impetus for the Samuel Warren and Justice Brandeis article is generally regarded to be the proliferation of Kodak cameras [FN22] taking "instantaneous photographs" that **318** the authors regarded as invading "the sacred precincts of private and domestic life." [FN23] As Warren and Justice Brandeis lamented, these cameras "rendered it possible to take photographs surreptitiously," [FN24] greatly weakening the right of people to live private lives. In response to this new phenomena, with the goal to prevent the "evil of the invasion of privacy by the newspapers" and "provide a remedy for the unauthorized circulation of portraits of private persons," Warren and Justice Brandeis set out to build from the blocks of existing common law a right to privacy that would protect the "privacy of the individual." [FN25] Analyzing other doctrines of law, including slander, libel, trade secret, and intellectual property, the scholars formed "the right 'to be let alone.'" [FN26] The article states that the common law "secures to each individual" the right to control how his being can be communicated to others. [FN27] The goal of this right was to protect the "inviolate personality" and the person's feelings from injury. [FN28]

Understanding that certain aspects of society are of "public or general interest," [FN29] Warren and Justice Brandeis excluded the right to privacy for those "who . . . have renounced the right to live their lives screened from public observation." [FN30] Among these "men of the first class" are candidates for public office, a person in a public position, or anyone who has assumed a position "which makes their doings legitimate matters of public investigation," [FN31] thus planting the seeds for the modern day newsworthiness exceptions to the public disclosure of private facts tort. However, Warren and Justice Brandeis were quite eager to apply this right to privacy for "those persons with whose affairs the community has no legitimate concern, from being dragged into an undesirable and undesired publicity." [FN32] **319** Warren and Justice Brandeis concluded "[s]ome things all men alike are entitled to keep from popular curiosity, whether in public life or not." [FN33] This article caused a renaissance in privacy law ideals. [FN34]

B. Modern Privacy Law

In the decades following the landmark Warren and Brandeis article, many cases were decided that relied on the right to be let alone. [FN35] Esteemed torts scholar Dean William Prosser concluded that the "law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff . . . that each represents an interference with the right of the plaintiff . . . 'to be left alone.'" [FN36] The four torts that were later codified by

Dean Prosser, who served as the reporter for the Restatement (Second) of Torts, were (1) public disclosure of private facts, [FN37] (2) intrusion upon seclusion, [FN38] (3) **320** appropriation of name or likeness, [FN39] and (4) false light. [FN40] By enumerating the torts, Dean Prosser clarified the existing law to make it easier for practitioners to apply. However, Dean Prosser was very skeptical and critical about the right to privacy, in particular because it gave the government the power to censor the press. [FN41] Instead of merely recapitulating the Samuel Warren and Justice Brandeis article and the subsequent case law, Dean Prosser was, in essence, placing his own torts perspective on the right to privacy. He fabricated a closely related, yet substantially different, body **321** of law. Prosser was actually attempting to recreate the law as he saw fit, much like he did when he spontaneously recognized the tort of intentional infliction of emotional distress based on a mental injury. [FN42]

Dean Prosser's privacy torts had the effect of halting the evolution of privacy law, as no one else has proposed any viable privacy torts in the four decades since his enumeration in the landmark law review article. [FN43] In addition, Dean Prosser's torts have become the most widely accepted conception of American privacy interests, as most states have accepted these torts via the adoption of Prosser's Restatement (Second) of Torts. [FN44]

Following Dean Prosser's codification of the privacy torts, generally, a person who is photographed in public is essentially left without a remedy. [FN45] The two most useful torts suited to solve the problem of being photographed are the intrusion upon seclusion tort and the public disclosure of private fact tort. The intrusion upon seclusion tort is interpreted to only apply when the victim was in a private location, thereby excluding anyone who happened to be on public property. [FN46] The public disclosure of private facts torts is interpreted only to apply when the matter disclosed had no newsworthy value. [FN47] Because newsworthiness is broadly defined, and judges generally defer to editors to determine newsworthiness after Florida Star, [FN48] a photograph with even the slightest social value is publishable without fear of liability. [FN49] These two restraining factors severely limit a plaintiff's ability to recover for a privacy violation when **322** recorded in public.

The leading case to illustrate this point is Gill v. Hearst Publishing Company. [FN50] In this case, a reporter secretly photographed a couple sitting in a park engaging in an amorous embrace for an article in Harper's Bazaar. [FN51] The magazine used the photograph in an article discussing how love makes the world go round. [FN52] The couple wanted their affections to remain private, as they thought they were alone in a park, and sued under the privacy torts. [FN53] Justice Spence, writing for the court, found that "[t]here could be no privacy in that which is already public." [FN54] The court held that if an event is newsworthy, mirroring Dean Prosser's newsworthiness standard, the court must perform a balancing test between the right "to be let alone" and the "the public interest in the dissemination of news and information consistent with the democratic processes under . . . freedom of speech and of the press." [FN55] In this case, the court found that the article was newsworthy, [FN56] without providing a satisfactory justification based on the facts. The majority attempted to justify this analysis based on the Samuel Warren and Justice Brandeis article, quoting that when "a man's life has ceased to be private . . . [the] protection is to be withdrawn." [FN57] However, having "pictures surreptitiously" taken by newspapers was exactly the invasion of privacy the Harvard luminaries warned against. [FN58]

In a stinging dissent, Justice Carter rejected the majority's conclusion, arguing that "there is no news or educational value whatsoever in the photograph" of the couple. [FN59] Noting that the identity of the couple was not necessary to advance any journalistic aspects of the story, Justice Carter commented "there is no reason why the publisher need invade the privacy of John and Jane Doe for **323** his purpose." [FN60] Channeling the legacy of Samuel Warren and Justice Brandeis, the dissenting opinion proclaimed, "These private citizens, who desire to be left alone, should have and enjoy a right of privacy so long as they do nothing which can reasonably be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 5 of 59

said to have news value." [FN61] Distinguishing between those who are genuinely in the public eye and those who just want to be let alone, Justice Carter sought to have the public disclosure of private facts tort "protect the right of the 90% who do not desire publicity or notoriety and who may be offended by publications such as that here involved." [FN62]

Displaying vast skepticism for the great deference the majority granted to editors to determine newsworthiness, the dissent found that the "[c]ourts should consider the effect of such publication upon the sensibility of the ordinary private citizen, and not upon the sensibility of those persons who seek and enjoy publicity." [FN63] Justice Carter feared that "the blameless exposure of a portion of a naked body of a man or woman in a public place as the result of inefficient buttons, hooks or other clothes-holding devices could be freely photographed and widely published with complete immunity." [FN64] Today, we see that he was correct in light of some of the provocative photographs Google Street View has captured. [FN65] Finally, Justice Carter drew a distinction between what is viewable in public and what is viewable by reproduction, by observing that what the couple "did in view of a tiny fraction of the public, does not mean that they consented to observation by the millions or readers of the defendant's magazine." [FN66] An opinion from the Second Circuit, similar to Justice Carter's dissent, recognized that certain aspects of Jacqueline Kennedy Onassis's life in public were of a private nature. [FN67] The court held that intrusive newsgathering techniques by a paparazzo may cause an *324 invasion of privacy, even when in public, finding that a "person does not automatically make public everything he does in a public place." [FN68]

Alas, since Justice Carter only wrote in dissent, and his opinion has no value as precedent, most of the privacy cases since Gill have adopted the majority's approach in finding that privacy does not exist when something is in public and is newsworthy. [FN69] Factoring in the Supreme Court's decision in Florida Star v. B.J.F., [FN70] the right to privacy in public is greatly weakened. [FN71] The fact that privacy in public is nonexistent under the current law is even more troubling since technology has evolved to invade privacy in more surreptitious and invasive ways than Warren and Justice Brandeis could have ever imagined. Unbeknownst to him, Justice Carter outlined in his dissent in Gill factors that can define torts committed with future technologies: (1) people *325 expect to be private when keeping to themselves, (2) intruding upon this solitude is offensive, (3) the intrusion is especially offensive when the image is reproduced, and (4) there is no news value in incidental occurrences of average people. These factors provide the foundation for the tort this article refers to as the right to your digital identity. This tort will provide a remedy when offensive images are recorded of people without their permission and are indiscriminately reproduced onto the Internet without any concern for newsworthiness.

C. Privacy Protections Promote Free Speech and Expression

The key to understanding privacy is to understand how a person chooses to change his speech and actions in varying contexts. [FN72] Inherent in each human being is a dichotomy between what society sees of a person and what that person knows about himself. [FN73] In fact, the "the first etymological meaning of the word 'person' was 'mask,'" as everyone exists behind a façade. [FN74] Generally, when a person is in public, he feels a cloak of anonymity. When no one is paying attention, people tend to act free and uninhibited. [FN75] People may feel comfortable exhibiting certain behavior in front of one audience when anonymity exists, but not in front of another audience when privacy is lacking. A person may comfortably and freely express himself when he has the perception of anonymity, even if it is in front of a close group of friends *326 because of the tight bonds within a social network, [FN76] because there is less fear that what is said or done can be used against

him to harm him. Anonymity allows people to act with fewer inhibitions, as they have the ability to control the risk of damage to their reputation.

The logical converse of this proposition is that when someone feels they are being watched, they tend not to act as free and uninhibited. [FN77] When a person feels that others may be looking, he will generally act differently. [FN78] Persistently recording a person and broadcasting the images out of context chills an individual's ability to freely express himself. If a person knows, or even is apprehensive that he is being photographed by omniveillance, his behavior will be even further modified because the observation will be indelibly recorded forever. [FN79] Recently, a German study analyzing how surveillance affects a citizen's behavior found that "[p]eople under surveillance behave differently than people who are not monitored--differently than free people." [FN80] Therefore, understanding the dynamic of people's perception of anonymity in public is critical for promoting positive uninhibited expressions.

Privacy and free speech can be thought of as two sides of the same coin. They are complementary, rather than competing, interests. [FN81] When properly balanced, they yield **327** optimal results. To further explore this, it is necessary to visualize two extremes. In a world with no privacy protections and unrestricted free speech rights, where everything can be known about everyone, free expression would suffer. A person would not want to express his true thoughts for fear of embarrassment, ridicule, humiliation, or retribution. [FN82] This fear would result in the ultimate chilling of speech.

However, in an alternate universe with absolute privacy rights and no free speech, there would be a similar outcome. A person would not be able to express his true thoughts, and would have to keep all of his emotions to himself. This restraint would also result in the ultimate chilling of speech. Therefore, rather than existing as competing interests, privacy and free speech complement one another when properly balanced to provide a symmetry to optimize people's desire to express themselves, and at the same time, minimizes any apprehension that such an expression may cause. Without privacy, people do not comfortably speak candidly. [FN83] Without free speech, people cannot speak candidly. For this reason, society should strive to achieve a dynamic equilibrium between free speech and privacy that can promote the optimal level of expression.

### III. Omniveillance

Omniveillance is briefly defined as omnipresent, omniscient, digital surveillance in public, broadcasted indiscriminately throughout the Internet, without any concern for newsworthiness. It is debatable whether omniveillance exists today, but it is inevitable that it will exist in the near future. Today, one of the neophytes in this emerging field is Google Street View. By dispatching a fleet of surveillance vehicles throughout the country that takes **328** high resolution photographs of everyone in public, and reproducing these virtual panoramas onto the Internet, Google has taken the first steps towards omniveillance. Although today's technology may seem relatively benign, the current progression of this phenomenon trends towards complete and pervasive surveillance. An Orwellian future of omniveillance could lead to the evisceration of privacy in public.

### A. Google Street View Can See You

Google is the leading Internet search provider for most of the world, and handles nearly seventy percent of Internet searches in America. [FN84] The popular site has become so embedded in American culture that the verb "google" has become synonymous with search and has even been added to popular dictionaries. [FN85]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The ubiquity and prevalence of Google in our culture was epitomized when Presidential nominee John McCain admitted that he would research on Google to vet Vice Presidential candidates. [FN86] In addition to Internet search, Google has also entered the geospatial imaging service with Google Maps, by providing free detailed maps and satellite imagery to the public. [FN87] In late May of 2007, Google introduced a new addition to Google Maps called Street View. [FN88] This new feature allows users to obtain a ground level panoramic view of New York, San Francisco, Las Vegas, Miami, and other U.S. cities. [FN89]

Google and a company called Immersive Media conducted *329 the digital survey of these cities. [FN90] Dispatching a fleet of nondescript and unmarked vehicles equipped with a clandestine panoramic surveillance camera, Google has been creeping through the streets of major American cities since 2005 and recording everything in sight. [FN91] Once the images are recorded, Google broadcasts the photographs onto an easily accessible Internet site that stitches the images together into a virtual landscape that allows a person to view the street scene as if he were there. [FN92] Street View allows you to zoom in and out, and spin around in a 360-degree camera angle to see precise details. [FN93] These recorded images offer unprecedented clarity, allowing users to see people's faces, license plates, and even a cat sitting on a windowsill through open curtains. [FN94] Recently, Google has announced plans to expand Street View to Canada [FN95] and Australia, [FN96] and has begun taking pictures in Paris, [FN97] Milan, [FN98] the United Kingdom, [FN99] New Zealand, [FN100] and Switzerland. [FN101] The *330 European Union Data Protection Working Party has already put Google on notice that this product would violate European privacy law, noting that "[m]aking pictures everywhere is certainly going to create some problems." [FN102]

Many civil libertarians and electronic privacy advocates were outraged at this new service. [FN103] Some people have been caught in rather embarrassing positions, as Street View has photographed a man wearing a wedding ring walking out of a gentlemen's club in broad daylight, [FN104] a man relieving himself in an alley in San Diego, [FN105] two women sunbathing near Stanford University, [FN106] a close-up of a scantily clad woman, [FN107] *331 young girls in bathing suits outside a car wash in Dallas, [FN108] a girl flashing the Street View camera, [FN109] a woman's undergarments exposed while leaning into a car, [FN110] a gentleman who was caught putting his fingers where they probably should not have been, [FN111] a man creeping into the shadows of an adult book store, [FN112] a possible drug deal in Chicago, [FN113] a teen aiming a gun at a young child, [FN114] a boy falling off his bicycle, [FN115] a car caught on fire, [FN116] and even a reflection of a radar gun showing that the Google surveillance-mobile was speeding in a school zone. [FN117] Recently, a couple in Pittsburgh filed suit against Google for photographing their home, alleging a violation of their privacy. [FN118] The case is currently pending before the Western District of Pennsylvania, and Google has filed a motion to dismiss. [FN119]

## B. Omniveillance Defined

It is important to distinguish Street View from previous *332 iterations of public recording that lack many of the distinguishing characteristics that make this new phenomenon such a deep invasion into society's privacy. Banks, hotels, and retail stores frequently use surveillance cameras to video-record customers for security reasons. Companies such as EarthCam already provide twenty-four hour Internet cameras in popular public locations that rebroadcast images onto the Internet for anyone to view. [FN120] More recently, average people attempt to become paparazzi with their digital cameras and cellular phone cameras, by posting photographs and videos of public occurrences onto the Internet with services like Flikr (a popular photo sharing web site), YouTube (a popular video sharing web site), and even user-generated news web sites. [FN121] New York City now allows cit-

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 8 of 59

izens to upload amateur videos or photographs of potential crimes to the police department's web site. [FN122] A new service known as geotagging, featured on the Apple iPhone 3G, automatically records the latitude and longitude coordinates wherever a photograph is taken. [FN123] This mild form of omniveillance allows a user to quickly photograph a specific event and upload the recording onto the Internet so that the location where the photograph was taken becomes linked to that picture.

As invasive as all of these recordings are, they are easily distinguished from Street View. First, these monitoring regimes are extremely limited in scope. The cameras are strewn out sparsely throughout specific areas. Second, the **333** recordings are not easily accessible. These providers do not store or archive images, but rather produce a new image over regular intervals. In addition, private businesses seldom make their recordings available to the general public. Finally, the recordings have extremely limited usability. These services provide a single point of view, with relatively crude image clarity.

As distinguished from previous forms of public monitoring, this new form of surveillance will be omnipresent, as it can record vast areas of space over a very small period of time. It provides the users of this system with omniscience to know everything happening in a specific location at a specific time. Furthermore, this information will be indefinitely retained, and easily accessible. When future versions of this technology is properly implemented, it will be possible to enter a time, date, and location, and witness what happened at that moment as if you were there. It is a virtual time machine. In addition, using facial recognition technology, it will even be possible to search for a particular person's location at any given recorded moment. Although Street View is currently only limited to urban metropolises, companies such as Everyscape seek to expand digital surveillance to rural locations such as ski-resorts, beaches, and other out-of-the-way places. [FN124] Another friendly neighborhood surveillance provider called Earthmine is developing technology that can record all stores, restaurants, and other locations in public. [FN125] No place would be safe from the unblinking eye of omniveillance.

Another key distinction between previous technologies and omniveillance is that images are now broadcasted throughout multiple electronic media without any concern for newsworthiness. The most insignificant, inconsequential, and ostensibly private facts can be instantly littered all over the information superhighway. Traditional media editors were limited by space as to how much information could be reproduced. Specifically, an editor would be constrained by **334** the amount of space and time available, whether it was the number of minutes on the evening newscast, or the amount of columns in a newspaper. As a result, only a certain amount of information about people involved with certain events could possibly have been thrust into the spotlight.

Traditionally, when courts deferred to an editor to help determine whether reproduction was appropriate, [FN126] the judge could reasonably rely on the economics of the media as a check on what could be published and as a limitation on invasions of privacy. [FN127] However, with omniveillance, no such editorial board exists. Rather, high-capacity hard drives and blazing-fast Internet servers [FN128] break free content providers from the traditional chains of columns in a newspaper or seconds in a television spot. The essence of omniveillance--instantaneous worldwide distribution, indefinite retention, and ease of access--rewards content providers for posting the maximum amount of information possible, without any restrictions. An anonymous posting to the Boing Boing web log about Street View accurately describes the quandary that is omniveillance: "Cameras aren't new, maps aren't new, the Internet isn't new, nor is Google or Microsoft. So why does this feel so freshly creepy to so many?" [FN129] This question is best answered by looking towards the near future of omniveillance.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*335** C. The Near Future of Omniveillance

    Although Google is extremely tight-lipped about the future of its search technology, combining various statements made by its officers with a look at the state of the art of emerging technology provides an eerie glimpse into the not-so-distant future of omniveillance.  According to Tim Berners-Lee, the inventor of the World Wide Web, the future of the Internet will be what he terms the "semantic web," where all aspects of a person's life are intricately connected online. [FN130] On the semantic web, if a person forgot where he made a purchase, he would be able to connect his bank statement with his calendar with his photo album, and the technology would not only tell him what he bought and when he bought it, but it would be able to show him a snapshot taken contemporaneously with the purchase to show him where he made the purchase. [FN131] Berners-Lee finds that this future will be about "creating a seamless web of all the data in your life." [FN132]

    Google has already begun its form of a semantic web in the city of Nanaimo, British Columbia, Canada. [FN133] The city has provided Google with detailed municipal information about their fire services, buildings, property lines, utilities, permit information, zoning history, garbage collection schedule, and even the location of cemetery plots. [FN134] In turn, Google incorporated all of this information into its Google Earth geospatial imaging system, and now allows residents to instantly see when the home garbage delivery will occur, how their property is zoned, and even where the closest fire truck is. [FN135] Google also allows a user to type in any address and read stories about news events occurring in that locale, [FN136] as well as view photos, videos, real estate listings, and other **\*336** content associated with that geographic area. [FN137] This aggregation of information that closely touches everyone's lives is a first step towards a semantic web. [FN138]

    In an interview conducted by the Financial Times, Google CEO Eric Schmidt admitted the company's future goal is to organize people's daily lives. [FN139] Specifically, Schmidt augured that one day "users [will] . . . be able to ask the question such as 'What shall I do tomorrow?' and 'What job shall I take?'" and Google would be able to answer those questions. [FN140] Udi Manber, Google's Vice President of Engineering in charge of Google Search, reaffirmed this sentiment, and posited that Google has "to understand as much as we can user intent and give [users] the answer they need." [FN141] Mr. Schmidt acknowledged that the primary obstacle to this goal is not the technology, but the lack of information Google possesses about people. [FN142] Talking to journalists in London, Mr. Schmidt stated, "We cannot even answer the most basic questions because we don't know **\*337** enough about you. That is the most important aspect of Google's expansion." [FN143]

    Mr. Schmidt acknowledged that Google is still in the early stages of gathering the information it has, and that algorithms can only be improved by better personalization. [FN144] What Mr. Schmidt did not mention was how this personalization, that is, the collection of personal information, would take place. Google's experiment in Nanaimo, British Columbia shows how it can organize the aggregation of this data from the real world. If Google really plans on telling a person what to do or which job to take, information must be gathered from sources beyond those on the Internet?namely the real world. [FN145] And that's where Google Street View can come in.

    The present iteration of Street View is technologically impotent and benign with respect to gathering information about people.  Using Street View, currently, the only way to gather information about people is by typing in an address and zooming around until a user sees something interesting.  Google's Vice President in Charge of Search lamented the Internet's current ability to understand images based on tags around it, but forecasted that in the future, computers will be able to discern the contents of a picture. [FN146]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

With the advent of photo-sharing Internet sites like Flikr, MySpace, and Facebook, people can now upload **\*338** photographs and "tag" a specific person's identity in the photo with metadata, as if they were captioning it in a scrapbook (i.e., John Doe is the third person on the left). Although currently the tagging process must be done manually, new facial recognition such as Google's Picasa system utilizes artificial intelligence computers to automatically index and tag the subjects of photographs. [FN147] Software like Polar Rose is capable of scanning the entire World Wide Web, matching faces with previously tagged photos based on similarities in biometric features, and automatically tagging the photo with the person's identity. [FN148] Berners-Lee mentions tagging as one of the key prerequisites to the semantic web. [FN149]

Once an image is tagged, these captions can be searched and indexed like any other document on the Internet. As a result of this emerging image-analysis technology, a search engine like Google can easily correlate a person's face with his name, contact information, personal preferences, friends, and any of his personal information located on the Internet. In fact, Google's Director of Product Management, R.J. Pittman, "said that Google is developing visual crawling software that can be used for facial recognition and scene analysis." [FN150] Applied to Street View, this future technology can be combined with tagging and advanced image search capabilities to identify anyone who is recorded by omniveillance.

An example of such a bridge between a person's online presence and the real world takes the form of new smart billboards, a preview of omniveillant technologies to come. A French company called Quividi has installed billboards in New York City equipped with cameras and powerful computers. [FN151] By analyzing the facial characteristics of a **\*339** person walking in front of the camera (e.g., "cheekbone height and the distance between the nose and the chin"), the billboard can roughly determine the age and gender of a passerby. [FN152] Based on this profile, the billboard, equipped with a large flat-screen television, delivers advertisements specifically targeted to the particular demographic. [FN153] The goal of this technology is "to tailor a digital display to the person standing in front of it--to show one advertisement to a middle-aged white woman, for example, and a different one to a teenage Asian boy." [FN154]

Imagine an alternative business model in an omniveillant society, wherein these cameras do not simply analyze the facial features of a promenading consumer, but rather snap a photo, and search tagged images on the Internet to ascertain the identity of the person. With this technique, the billboard does not simply know the person's age or gender, but can ascertain what online stores the person frequents, who the person's friends are, and volumes of other personal information. An advertiser's dream, indeed! Imagine further that the billboard recorded how long a person stared at the billboard, in order to gauge his interest at a particular advertisement, or even whether a person began discussing the billboard with a fellow spectator. Unassuming spectators would be unknowingly conscripted into serving as a veritable Nielsen rating focus group. This information could be further disseminated throughout the Internet to create a profile about a person's likes, dislikes, and preferences. The information gleaned from these billboards could serve as a perfect conduit for an omniveiller to gather more information about people from the real world, in order to tell them things like "'[w]hat shall [they] do tomorrow'" or "'[w]hat job [should they] take.'" [FN155]

Social-networking Internet site Facebook announced that it is opening up user profiles to search engines like Google **\*340** using a technology called Facebook Connect. [FN156] Facebook's Senior Platform Manager commented, "We believe the next evolution of data portability is about much more than data. It's about giving users the ability to take their identity and friends with them around the Web." [FN157] Social networking giant Myspace also announced its "data availability" project that opens up profile data to the entire Internet. [FN158] This access will enable search engines to search the personal information of millions of Americans.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

Although the current version of Street View is limited to pre-recorded still photographs, future technology will allow real-time streaming video feeds of everything occurring in public. Immersive Media, the company that provides the surveillance apparatus for Google, has not stopped its research at still photographs. Currently its laboratories it is developing what it calls "Immersive 360? Video" or "Spherical Video." [FN159] Rather than just taking still shots of specific locations, the technology can record interactive and navigable 360-degree videos. [FN160] This capability allows a user to watch a video from multiple camera angles. [FN161] These omens ominously bear on the value of Street View, and create a scary image of what Google could do. Because there is no viable right to privacy in public, and because Google seeks to create a visual map of the planet, there is nothing preventing Google or any other company from installing such video cameras with tagging capabilities on the rooftops of private business throughout America. This vision of the future poses serious issues and conjures up an Orwellian nightmare. [FN162]

If a live video feed of every action a person takes is recorded and broadcasted over the Internet, facial recognition technology, similar to Polar Rose, can be applied. The effect **341** will be that the technology could instantly and automatically tag every person in a city. At any given moment, these cameras would know what stores a person goes to, what doctors a person visits, what activities a person engages in, and even if someone breaks the law. In fact, recent facial-recognition technology can diagnose various genetic disorders based on certain characteristics in a person's face. [FN163] This technology can even be used to identify people's diseases, which could be the ultimate violation of privacy. [FN164] In light of the fact that Google and others now allow people to store their medical information in a centralized location, if this most confidential data was ever released onto the Internet, people's most intimate health concerns could be exploited by omniveillance. [FN165] Currently, people who seek to stay out of the limelight can avoid using a computer, abstain from posting to blogs, and miss out on all of the fun of social networking. However, under this new regime, you can't run; you can't hide; there is no escape.

D. The Need for a Tort to Remedy Omniveillance

While a government-surveillance database would be constitutionally limited for local and national security purposes, a private sector database used for commercial purposes would be virtually unfettered. Google, or any other omniveiller, could create an expansive database of what a person does online, and what the person does while away from the computer with no legal repercussions. This presents societal problems, as broadcasting a person's private behavior may damage his public reputation and prevent an opportunity for him to grow and reform. Recording people in **342** public also places limitations on free expression because the inability to communicate privately chills expression. Finally, such recordings can even create safety issues, as those with nefarious ends can easily learn people's most intimate, unguarded, and vulnerable behaviors. Further, even if Google or any other company adopts a stringent privacy policy, there are substantial risks to aggregating so much personal information in a single repository--especially in light of computer hackers who might be able to expropriate this information. [FN166] This article does not seek to impugn Google or any other company. The point that must be stressed is the risk inherent in allowing any entity the ability to collect so much information, unfettered by any concerns for privacy. If said information falls into the wrong hands, America's conceptions of privacy can be greatly damaged, if not destroyed.

1. Threat to Reputation

One of the greatest threats that a lack of privacy protections in public places poses is the potential to damage

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 12 of 59

a reputation. [FN167] Personal information that is taken out of context can often lead to unfair judgments that can prevent learning more about a person's character. [FN168] When a person chooses to share intimate information with a select group of people, he is able to prevent common misjudgments by providing context for his behavior. [FN169] If a person engages in *343 an activity that is misunderstood within a circle of friends, he generally will have a chance to explain what happened. [FN170] If the information is widely disseminated, the person will have no such opportunity.

This dynamic greatly impacted the reputation of Chief Judge Alex Kozinski of the Ninth Circuit Court of Appeals.  Judge Kozinski's family maintained a personal Internet server containing certain questionably obscene photographs that they intended only to be viewed by close acquaintances. [FN171] While Judge Kozinski was hearing an obscenity trial, a media reporter revealed the existence of these images. [FN172] After his impartiality was challenged, Judge Kozinski recused himself and requested an investigation into his performance. [FN173] The Judge knew the pictures were on his Internet server, but he thought they were only for consumption of an audience limited to his friends and family. [FN174]

This situation differs from omniveillance in that the pictures on the personal server were not of the Judge, yet they nonetheless exemplify an aspect of his character, which in effect is a telling portrait of his persona. A judge's private information on the Internet, viewed by an unintended audience and taken out of context, tarnished the reputation of a venerated and respected jurist.  An omniveillance recording of an unsuspecting person engaging in a societal taboo could have similarly dangerous effects to a person's reputation.

In the context of omniveillance, where an image captured of a person engaging in an activity may easily be taken out of context, such a chance to explain the photograph is not a *344 possibility, as the subject might not have even been aware he was recorded. [FN175] According to privacy scholar Professor Daniel Solove, "[p]rivacy encourages uninhibited speech by enabling individuals to direct frank communications to those people they trust and who will not cause them harm because of what they say." [FN176]

As Professor Solove astutely noted, the virtue of knowing less shows that "[a]lthough more information about a person might help enrich our understanding of that person, it might also lead us astray, since we often lack the whole story." [FN177] For example, if a wife saw an image of her husband walking out of an adult bookstore, there could be an immediate rush to judgment. Without jumping to any conclusions, the accused husband could have needed to urgently use the bathroom, might have been waiting to pick someone up, or maybe was lost. Nonetheless, once his privacy is violated, most people do not get a second chance to rectify these concerns. When this kind of information is revealed to strangers, prejudice and misjudgments abound. [FN178]

Recording, broadcasting, and archiving a person's actions may deny him the opportunity to grow and reform. [FN179] Like an elephant, the Internet never forgets. [FN180] Once an image is released, even if it is removed from a web site, it will invariably be stored forever elsewhere. [FN181] For example, if a person is photographed entering a strip club, and he later decides to change his ways, society should at least allow him the opportunity to improve and reform. But once this image is recorded and preserved in perpetuity, the individual may *345 never be able to live down what could have been a single error. [FN182] Essentially, this is a case of the tragedy of the commons. Omniveillers are able to internalize the value of the streets, buildings, and people in major American cities by relying on weak privacy torts. Meanwhile, the people who are being photographed suffer a negative externality, namely the invasion of their privacy and damage to their reputation, which they have no way of remedying.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 13 of 59

The story of "gae-ttong-nyue," roughly translated from Korean as "dog poop girl," is an excellent illustration of this phenomenon. [FN183] On a subway train in South Korea, a woman's small dog defecated on the floor, and the owner refused to clean it up after a fellow passenger asked her. [FN184] By itself, this may seem like a random incident that happens countless times a day that people forget as soon as they see it. [FN185] However, the Internet has forever changed this dynamic. [FN186] A nosey photographer on the train snapped a digital picture of the dog owner on his cellular phone and posted it on a popular Korean web log. [FN187] The girl was quickly nicknamed "gae-ttong-nyue," her picture was broadcasted and parodied all over the Internet, and people started recognizing her on the street. [FN188] Soon, the story spread to newspapers and web sites worldwide. [FN189] Because of the power of the Internet, what once would have been an isolated incident that people forgot as soon as it happened transformed into a global craze. [FN190] As a result of dog poop girl's public shaming and embarrassment, she was forced to drop out of her **346** university. [FN191]

Once a secret is out, society cannot unring the bell. [FN192] The dog poop girl "will not be forgotten. That's what the Internet changes . . . [and] forever, she will be captured in Google's unforgiving memory" in the form of a permanent digital scarlet letter. [FN193] If this incident would only have been recalled by the select few who witnessed it, those people may have been able to obtain an explanation why the girl refused to clean up the mess. Perhaps there was a legitimate and valid reason why she chose not to clean up her dog's droppings. However, because of the unblinking eye of digital cameras and the outbreak speed that the Internet enables, this woman will never be able to provide an explanation. If a person does find an image of himself that he finds offensive, there is little recourse to tell his side of the story.

2. Threat to Free Speech and Expression

Failing to protect privacy in public can also inhibit free expression. It is important to remember that speech and expression are not limited to writing and speaking. Rather, a person's choice to be present in various locations in front of a specific audience is indicative of speech as "expressive conduct," and is a form of protected expression under modern First Amendment jurisprudence. [FN194] A person marching in a **347** protest, walking into a political campaign headquarters, or sleeping in front of the White House, all convey a specific message, even though no words are spoken or written. This distinction is especially profound in the case of omniveillance, where people are plucked from anonymity and thrust into the public eye based on their location at an instant in time. Recording people's activity can have chilling effects on speech. People may choose to moderate their behavior in order to avoid harassment, if they are embarrassed of their actions, or fear retaliation by others for their choices. By positively protecting an omniveiller's speech (the right to reproduce photographs), society is negatively restraining an individual's speech (the right to freely express himself).

For example, suppose that a person leads a very upright and moral lifestyle in his public life. However, on the side, he chooses to engage in immorality and debauchery, and does not want or trust others to know about that side of his character. Because people often express different types of personalities in different contexts, the recording and broadcasting of his behavior would destroy the voluntary dichotomy in his life. This can result in a chilling effect where people feel suffocated and will be afraid to express themselves as they would like, for fear of being caught.

Personal information posted on the Internet has already detrimentally impacted job candidates who were denied employment because of their embarrassing user profiles on Facebook, a popular social networking Internet site. [FN195] Chief Judge Alex Kozinski of the Ninth Circuit Court of Appeals recused himself from an obscenity trial after questionable obscene images were found on his personal Internet server. [FN196] In the case

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R   Document 36-3   Filed 02/08/10   Page 14 of 59

of Ashley Alexandra Dupre, also known as Kristen, who was connected with former New York Governor Spitzer in a prostitution sting, the aspiring "musician" quickly attempted to delete information from her Facebook and MySpace profiles after the New York Times released her identity, in order to avoid further embarrassment. [FN197] Other **348** people who post religious, cultural, and political opinions have reported unwanted harassment. [FN198] The only difference between Facebook or MySpace and omniveillance is that the Facebook personal profile was voluntarily created. With omniveillance, the individual had no choice, but rather was thrust into the public eye. [FN199]

Computer hacker Tom Owad illustrated how the aggregation of information on the Internet can stifle free speech.  By taking data from online retailer Amazon.com's customer wish lists (books customers wish to buy), and combining those wish lists with a customer's address, Owad developed a program that allows anyone to locate satellite pictures on Google of the homes of people who are reading "subversive books" (including works by authors such as George Orwell, Aldous Huxley, and Ray Bradbury). [FN200] To display what books a person chooses to read, and then to locate where they live, can chill speech in unimaginable ways. If Owad decided to incorporate his program using Street View, people walking on the street could be identified by the books they read, and prejudicial assumptions can be drawn about them that may or may not be true. The right balance of privacy and information, where neither is absolute, can foster promotion of individual autonomy and expression and will provide a positive externality to society. In fact, under the right circumstances, "privacy protections do not just inhibit free speech; they can promote it as well," as "some restrictions on speech can enhance our freedom to speak." [FN201]

3. Threat to Safety

In addition to the effects of insufficient privacy protection on a person's reputation and his ability to freely express himself, omniveillance also poses great threats to a person's safety.  Google is already providing a "mashup" service that allows Internet users to incorporate Street View panoramas **349** onto their own Internet sites. [FN202] As well, Google recently introduced its "Friend Connect" service, allowing Google to pull personal information from other social networks onto third-party websites. [FN203] This functionality could allow data-mining companies to expropriate this information from Google's database for other purposes. This information could also become accessible to those with nefarious motives. Possibilities of black mail, extortion, and fraud are endless. Imagine someone threatening a husband to show his wife pictures of him near a strip club, or another person threatening to expose an evangelical minister's wife who was photographed entering a women's health clinic.

Omniveillance even poses a threat to national security.  Fearing that terrorists could use detailed photographs of federal buildings for malicious ends, the Department of Defense has already banned Google from photographing military bases using Street View. [FN204] In the United Kingdom, demonstrators who protested on top of the House of Parliament utilized Google's satellite maps to plan their trespass onto government property. [FN205] Also in England, trespassers are using Google's satellite imaging service to find where swimming pools are located, and subsequently to break into people's backyards. [FN206] This new technology may also make planning crimes easier. A potential criminal may easily case houses or understand the schedules of potential victims in planning the commission of a crime. [FN207] A group **350** called Stop Child Predators is seeking to ban Google from photographing neighborhoods, contending that Street View allows child predators to easily see where minors congregate, which could be used to target society's most innocent victims. [FN208] This predatory behavior becomes as facile as clicking around the Internet. Cyber-stalking can take on a whole new meaning. Additionally, with a subpoena, the government has ready access to a free surveillance network, further imperil-

49 Santa Clara L. Rev. 313

ing our civil liberties. [FN209] At this stage, Warren and Brandeis's right to privacy is no longer on life support or in limbo, but rather is dead. [FN210]

### E. Existing Privacy Torts Are Incapable of Dealing with Omniveillance

Often the law strives to keep up with emerging technology. [FN211] Privacy is a perfect example of this phenomenon. The advancement of technology may make the "right to be let alone" a casualty of the information revolution. [FN212] Omniveillance could push this limit almost to its breaking point by exploiting the images of every person in America into a virtual commercial Orwellian state. Omniveillance is an entirely new species of privacy invasion, and should be treated differently. I do not intend to paint a bleak picture of the future, but privacy law has not kept pace with emerging technology. As dangerous and threatening as **351** this new technology is to society, there is little that can be done about it under current privacy jurisprudence.

Due to the modern interpretation of privacy laws, few remedies exist for invasions of privacy in public. The public disclosure of private facts tort is restrained by a very broad newsworthiness exception that recognizes any matter that possesses a modicum of social value as newsworthy, and thus can be reproduced without concern for privacy. [FN213] The intrusion upon seclusion tort does not apply when an invasion occurs in public, thereby allowing omniveillers to freely graze upon the commons, internalizing all of society's positive externalities, and shifting the negative externalities to the people. [FN214] Just like a couple embracing in public, [FN215] or a soccer player's genitalia slipping out, [FN216] anything that happens in public or anything that could be considered newsworthy cannot be remedied by the existing privacy torts. For that reason, the invasion of privacy suit filed against Google by the couple in Pittsburgh whose house was photographed by Street View will surely fail, as under the current jurisprudence, photographing anything visible from public streets is perfectly proper. [FN217]

In the absence of any legal obligations, corporations are only bound by their internal corporate ethics. Over a year after the launch of Street View, Google announced an initiative to develop a technology to blur out people's faces in its Street View program. [FN218]

Praising this blurring initiative, a Google spokeswoman said that "[t]he purpose of Street View isn't looking at people, it's looking at buildings and locations. Obviously, we want to take steps in protecting people's privacy, but from the **352** beginning we've been committed to doing this." [FN219] However, less than a year earlier at the time of Street View's launch, Mr. Flesicher, Google's Privacy Counsel, was asked why Google did not blur out people's faces in order to assuage privacy concerns. The attorney retorted that "[i]t comes down to a tradeoff between free speech and a wealth of information and a 'city of [blurred-out] zombies.'" [FN220] Such a blatant contradiction on a fundamental aspect of Street View raises serious concerns about the ethos of a company that aggregates so much information about millions of people. Grotesque! [FN221] Further implicit in this new technology is Google's possession of a capability that can discern what is and what is not a face, underscoring the evolution of its powerful image searching and tagging capabilities. [FN222] If Street View can blur a face, with existing facial recognition technology, it could reasonably also ascertain the face's identity.

Even if Google does blur people's faces in Street View at the present, its motivation was not to comply with any legal compulsions. [FN223] What is to prevent it from changing its mind tomorrow and deciding that a valuable purpose of Street View is to reveal people's identities? Or what if the blurring process is inadequate, and fails to properly obscure a person's identity? Or what if a computer hacker figures out a way to unblur the faces? Although Google does offer an option where people can request a certain image be removed from Street View,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

[FN224] there is no guarantee the company will oblige. What Google giveth, Google taketh away.

In the case of omniveillance, no valid legal mechanism exists to enjoin this behavior. If at some point in the future, Google, or any other omniveiller, decides to voluntarily make peoples' faces clear and identifiable, no law or legal concern would prevent it. In the words of the attorney representing the Pittsburgh family who sued Google for invasion of **353** privacy, "[w]hat's to motivate them to change and put in better internal controls?" [FN225] Short of Google's self-proclaimed goal to do no evil, it has no legal incentive to protect privacy in America. [FN226]

Appropriate action needs to be taken now to address these issues, and preempt the identical world of Big Brother that prominent writers and futurists have warned about for decades. Some may suggest banning omniveillance altogether, much like Canada may be contemplating. [FN227] But, such a broad approach would be unnecessarily restrictive and overbroad. Further, under American free speech jurisprudence, such a ban would most likely conflict with the First Amendment. [FN228] Others may suggest banning omniveillers from recording on public property by resorting to trespass laws. North Oaks, Minnesota, an enclosed and resident-owned community, relying on trespassing laws, complained about the photos and succeeded in having them removed from Street View. [FN229] In a small town, for example, such steps may be practical, but in larger areas, the costs of policing this could become astronomical. Allowing an enforcement agency to inspect and monitor people and their vehicles for recording instruments would require substantive transaction costs, and may run afoul of the search and seizure protections of the Fourth Amendment. Compared to these more-onerous and inefficient means, the right to your digital identity is a crucial sword in the battle for privacy rights in America. In sum, the Google generation needs the right to your digital identity in order to provide victims of omniveillance with a remedy in tort, and create an **354** equilibrium between privacy and free speech.

### III. The Right to Your Digital Identity--a Tort to Remedy Victims of Omniveillance

Threatened by the specter of omniveillance, our near-future selves will need a remedy in order to redress violations of our right to privacy. This section will introduce the right to your digital identity. This tort will provide a remedy when a person's image is converted into a digital image and distributed over the Internet. This tort does not focus on government surveillance or Fourth Amendment issues. This tort will be based on the philosophy that there is positive societal value to protecting privacy in public, and that privacy can actually promote free speech and prevent negative societal effects. [FN230] This tort will consist of a multi-factor balancing test to preserve the precious equilibrium between free speech and privacy, and will be enforced as a common-law tort. This framework will draw together many aspects of privacy law from the Restatement (Second) of Torts, the common law, criminal law, and more recent privacy statutes that have evolved to deal with changing social and technical developments. All of these factors serve as useful guideposts to develop the right to your digital identity.

By implementing a multi-factor balancing test that takes into consideration the necessity of a free press, but also factoring in privacy interests, this tort will provide judges with a fair scale to balance the privacy suit of a victim of omniveillance. No single factor is dispositive. Rather, the totality of the circumstances determines if liability is appropriate in a case where omniveillance invades privacy. The following is a concise statement of the right to your digital identity:

The right to your digital identity is violated when an individual or organization records and reproduces an image of another without consent using a visual or auditory enhancing device while (1) the party

recorded possessed a reasonable expectation of privacy to not be recorded; (2) the matter recorded would be offensive to a reasonable person; (3) the **\*355** recording is intentionally widely transferred or disseminated through any electronic medium to any electronic format; and (4) the recording is not newsworthy, where a newsworthy recording (4a) has social value, (4b) minimally intrudes into ostensibly private affairs, and (4c) the party that is recorded voluntarily acceded to the position of public notoriety.

The following analysis, fashioned in the format of the Restatement of Torts, will provide analysis and comments for each of the elements, in addition to illustrations of how the tort would be applied under different circumstances. [FN231]

## A. Element 1--Reasonable Expectation of Privacy to Not Be Recorded

The first element of this new tort is based on the tort of intrusion upon seclusion, [FN232] rather than public disclosure of private facts. [FN233] The intrusion tort is more adept at dealing with the nature of the omniveillance invasion; it focuses on the intrusion rather than the subsequent dissemination of the private image. Therefore, Florida Star, [FN234] which severely limited the tort of public disclosure of private facts, is not on point, and does not serve as a bar to liability for this element. The primary obstacle to the intrusion tort providing a remedy for omniveillance does not lie in the Restatement's definition of the tort, but rather exists in the comments. While the tort **\*356** allows remedies for intrusions upon a person's "private affairs or concerns," [FN235] which logically includes protection of a person acting within a public place, the comments refute this notion and insist that a person photographed in public is by definition not in seclusion. [FN236]

Although a person relinquishes a large portion of his privacy by leaving his home, a person does not give up all of his privacy. [FN237] Such a binary proposition, that privacy only exists in a private place but disappears in its entirety once a person steps out into public, is untenable. [FN238] This strict interpretation of the intrusion upon seclusion tort is not capable of fostering an understanding that privacy far exceeds simple notions of physical seclusion. [FN239] Privacy is not an all-or-nothing proposition, but is a matter of degree. [FN240] Thus, this element borrows ideas from criminal law, paparazzi statutes, and voyeurism statutes, where the law has developed a nuanced view of privacy and has recognized a qualified right to privacy on public property. The right to your digital identity abandons the strict public/private property distinction and discerns whether the victim possessed a reasonable expectation of privacy.

### 1. Reasonable Expectation of Privacy and Privacy in Public

The concept of a reasonable expectation of privacy was first recognized in the landmark criminal law decision, Katz v. United States, where the Supreme Court held that privacy **\*357** can be violated even when a person is in a public phone booth. [FN241] As long as the person possesses a reasonable expectation of privacy, regardless of whether the person was on public or private property, privacy exists and should be protected in the Fourth Amendment context. [FN242] Katz overruled the prior precedent of Olmstead v. United States that was similar to the tort of intrusion upon seclusion, as Olmstead held that privacy could only be violated if there was a physical trespass onto private property. [FN243] The Katz Court defined reasonable expectation of privacy based on a subjective element determined by what the defendant thought, and an objective element based on what society recognized as reasonable. [FN244]

This concept is not limited to criminal law. California chose to abandon the strict distinction between public and private property when crafting its paparazzi statutes. [FN245] The California legislature recognized that most of the invasive photography by paparazzi occurred in public, and that skilled paparazzi rarely trespassed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

onto private property. [FN246] Because the intrusion upon seclusion tort is only effective for protecting people on private property, this tort could not provide an effective remedy. [FN247] As a result, the California legislature devised the notion of constructive trespass. [FN248]

Under the California paparazzi statute, rather than drawing a distinct line between public and private places, when a paparazzo attempts to capture an image where a person has a "reasonable expectation of privacy" by using a "visual or auditory enhancing device," the defendant is liable. [FN249] This statute invoked the distinction that the California Supreme Court discussed in Sanders v. ABC--in that there are "degrees and nuances" to privacy. [FN250] By **358 codifying this understanding, the legislature implicitly acknowledged that a person's mere presence in public is not an absolute bar to recovering for an invasion of privacy. Therefore, if a victim has a reasonable expectation of privacy, even if he is in a public location, the paparazzo could still be found liable for constructive trespass, because no physical trespass is required.

Recently, Los Angeles councilman Dennis Zine proposed a new ordinance creating a "personal safety zone" of several feet of clear space between a paparazzo and the victim, dubbed "Britney['s] Law," thus recognizing that a zone of privacy can exist in public. [FN251] The Mayor of Malibu has also called for the creation of a safe zone around celebrities. [FN252] These laws serve as an important step towards recognizing privacy in public, eschewing with the binary Restatement approach, and are an important basis for the first element of the right to your digital identity.

Laws prohibiting voyeurism exemplify another prime example where legislatures have adapted the law to create a specific realm of privacy within public in order to adapt to the evolution of society and technology. Implicit in voyeurism is the surreptitious recording of people without their consent, often by positioning cameras in hidden places with the intent to photograph a person's intimate areas. [FN253] In order to combat this invasion of privacy, California passed a "Peeping Tom" statute closely modeled after the intrusion upon seclusion tort. [FN254] The statute criminalized looking into a private area where the occupant possessed a reasonable **359 expectation of privacy using a recording device with the intent to invade the person's privacy. [FN255] However, this law still failed to provide any protections for voyeurism in public, as the intrusion upon seclusion tort is restricted to private areas (such as bathrooms, locker rooms, etc.). [FN256] As a result, voyeurs who photographed the most sensitive areas of non-minors in public escaped any liability. [FN257]

In response to some of the more egregious voyeurism stories in the news [FN258] and recognizing this loophole that traditional privacy law created, the California Legislature enacted Chapter 231. This law amended the previous Peeping Tom statute and expanded the protection area from a private area to any public area, where the voyeur has an intent for sexual gratification and the victim possesses a reasonable expectation of privacy. [FN259] By widening the target zone to wherever "the other person has a reasonable expectation of privacy," [FN260] the legislature implicitly recognized that even when a victim is in public, if he nonetheless possesses a reasonable expectation of privacy, then he will still be protected. So as not to encroach on First Amendment protections for the press, this amendment did not criminalize **360 the works of photojournalists. [FN261]

The problem of voyeurism has become even more exacerbated since the introduction of cell phones equipped with digital cameras, the sales of which have recently surpassed those of traditional digital cameras. [FN262] These portable devices enable a Peeping Tom to secretly snap photographs of anyone at any time without notice, and easily upload these photographs to the Internet for anyone to view. [FN263] This is exactly what Samuel Warren and Justice Brandeis feared when they wrote about instant cameras surreptitiously weakening privacy rights. [FN264] In response to this outbreak of voyeurs secretly photographing people's private areas

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

without their consent, [FN265] Congress passed the **Video Voyeurism** Prevention Act of 2004 that prohibited capturing an image of a person's private areas without their consent. [FN266] Textually, the act does not treat being filmed in public as an absolute bar to liability, but rather focuses on whether the victim possesses a "reasonable expectation of privacy" that can exist "regardless of whether that person is in a public or private place." [FN267]

The relevant legislative history [FN268] shows that the act is *361 based on the "well-accepted legal concept that individuals are entitled to a reasonable expectation of privacy." [FN269] Departing from the strictures of the Restatement (Second) of Tort's intrusion upon seclusion tort, and resuscitating the "right to be let alone" from Samuel Warren and Justice Brandeis, Congress had specifically identified that in certain circumstances, a reasonable expectation of privacy does exist in public places.

Following the passage of the federal act, many states amended their local laws to provide similar protections. [FN270] In the state of Washington, the legislature passed a voyeurism statute that created liability for voyeurs. [FN271] The law applied to victims in a place where there a reasonable expectation of privacy could be found. [FN272] However, adhering to the comments from the Restatement of Torts, [FN273] the Washington Supreme Court found that "the voyeurism statute, as written, does not prohibit upskirt photography in a public location," even if that was the legislature's intent. [FN274] In response to this case, the Washington Legislature amended the voyeurism statute to specifically permit liability if the victim possesses a reasonable expectation of privacy "in a public or private place," clearly evincing an intent to create a zone of privacy in public places. [FN275] In Louisiana, the voyeurism statute draws no distinction based on whether the victim is in a public or a private place, or even whether he possesses a reasonable expectation of privacy. [FN276] Rather, if a person is recorded without his consent for lascivious purposes, even if it is a public place, the voyeur has violated the law. [FN277]

*362 2. Application of Reasonable Expectation of Privacy to Omniveillance

Katz, the California paparazzi laws, and the voyeurism statutes "represent[] a shift of the boundary line in the battle between privacy of individuals within society and the community in which they live in favor of individual privacy, and therefore impact[] the relatively new but dynamic field of privacy law." [FN278] Building on these blocks, the first element of the right to your digital identity tort asks whether a reasonable expectation of privacy exists. Even though the laws discussed apply to prevent sexual deviancy or aggressive celebrity obsessions, the lessons and principles still apply to omniveillance. An expectation of privacy not to have your genitals photographed is obviously greater than an expectation of privacy not to have your face photographed. But this philosophy should serve as a starting point. Regulating immoral aspects of society should not be the end of the road for developing privacy law. Rather, by analyzing the rationales behind these privacy laws together with the societal costs and benefits associated with such legislation, a judge can properly assess whether a person possesses a reasonable expectation of privacy.

Returning to Katz, the test to determine if a reasonable expectation of privacy exists is based on whether the individual possesses a subjective belief that he has an expectation of privacy, and whether society is prepared to recognize that belief as reasonable. [FN279] To slightly modify Katz for this tort, this element does not embody an expectation of privacy not to be looked at, but specifically requires an expectation of privacy not to be recorded. Whenever a person goes outside, he expects to be watched by others-- but he does not expect to be photographed.

Questioning whether a reasonable expectation of privacy exists solves several logical problems inherent in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

limiting privacy protections to a private location.  To illustrate this conflict, if a person sits on his balcony, or next to a window in plain view of the public, the intrusion upon seclusion tort would probably protect him.  Conversely, if a person leaves the confines of his home and climbs to the top of the tallest **363** mountain to be alone, the intrusion tort would not protect him because it is not considered private property. Furthermore, another distinction must be drawn between different notions of "public." The middle of Times Square and the middle of a forest may both be considered public property, but the relative expectations of privacy in these locations are worlds apart. Both an individual and society would recognize that a person meditating alone at the top of a mountain or reflecting with nature inside a park could have a reasonable expectation of privacy, thus satisfying the two prongs of Katz. But the same cannot be said for someone sitting on his balcony facing a busy street filled with reporters. Nonetheless, the privacy torts identically treat both of these dissimilar situations. This goes against reason.

In the context of omniveillance, a person who walks on the street in a major city has a reduced expectation of privacy to not be recorded.  However, this level is greater than zero, depending on the person's identity and repute, the individual's location, the time of day, the amount of other people who can see the person, and the manner in which the person may be camouflaging himself (hat, sunglasses, fake beards, etc.).  By analyzing whether a reasonable expectation of privacy exists, this test balances what a person chose to expose to the world, and what precautions were taken to prevent exposures.  This factor of the right to your digital identity is a balancing test that must be judged on a case-by-case basis.

## B. Element 2--Offensive to Reasonable Person

The tort of public disclosure of private facts utilizes the "highly offensive to a reasonable person" standard. [FN280] Since this standard was promulgated, society has become somewhat accustomed and desensitized to privacy invasions in light of reality television programs and celebrity gossip magazines. [FN281] **364** What was once highly offensive may now only be offensive, and what was once offensive, may not be anything out of the ordinary today. The "highly offensive" standard is simply "a difficult standard to satisfy." [FN282] In order to rise to the level of highly offensive, the conduct must be so intrusive that it would cause "mental suffering, shame or humiliation to a person of ordinary sensibilities." [FN283] Applying the current understanding of "highly offensive" to omniveillance, very few adjudicators would be able to find liability under the tort of public disclosure of private facts, as very little is highly offensive these days. [FN284] Justice Carter's fear in his dissent in Gill that "the blameless exposure of a portion of a naked body of a man or woman in a public place as the result of inefficient buttons, hooks or other clothes-holding devices could be freely photographed and widely published with complete immunity" [FN285] has come to fruition.

A more realistic understanding of offensiveness is highly relevant in light of omniveillance, since often people are caught at their most embarrassing moments in the camera's lens.  Short of a person being photographed without clothes, or engaged in a lewd position, there is not much that is considered highly offensive in today's society.  However humiliating circumstances may be, if they fail to rise to the highly offensive level, no remedy is available.  A photograph **365** of a person inappropriately scratching himself in public may not qualify as highly offensive. But it would more likely satisfy an offensive standard. Similarly, a photograph of a couple passionately kissing may not be considered highly offensive, as this is standard fare on prime-time network television. But it may be considered offensive. If a person is readily identifiable, the level of offensiveness must increase. In the event that an omniveiller blurs a person's face so that the individual is unidentifiable, the level of offensiveness drops to a nullity. By changing this standard for omniveillance to offensive, the trier of

fact will be able to properly assess liability based on what is offensive to a reasonable person. The finder of fact would not be constrained by such a high threshold, as it is quite an unworkable standard in light of modern day insensitivity to grossly offensive images that are repeatedly broadcasted throughout the media. As a result, a victim of omniveillance has a legitimate chance at obtaining a remedy if the nature of the photograph is simply offensive.

Recognizing the evolution of society, as it now takes more to offend a reasonable person than it did when the Restatement privacy torts were promulgated, California's paparazzi law departed from this traditional standard of "highly offensive to a reasonable person," and applied a lower "offensive to a reasonable person" standard. [FN286] This allowed wider application of the law, tipping the scale in favor of privacy and against the unlimited right of the press to gather information. Following this development, the second element of the right to your digital identity proposes lowering the threshold to offensive to a reasonable person to allow for a viable remedy against offensive reproductions of a person's image.


C. Element 3--Widely Transferred or Disseminated through an Electronic Medium

One of the most important aspects of the right to your digital identity--that distinguishes it from previous privacy torts--is the requirement that the recording be indiscriminately disseminated to an electronic forum without **366** a concern for newsworthiness. [FN287] The concept of dissemination in privacy torts is most prominent in the tort of public disclosure of private facts, where liability is determined based on whether the defendant disclosed the information to others. [FN288] The third element of the right to your digital identity will focus on quantifying the distribution of the recording. Whereas the tort of intrusion upon seclusion occurs once the invasion occurs, [FN289] the tort of public disclosure of private facts occurs when non-newsworthy and highly offensive images are reproduced and disseminated. [FN290] For this reason, the disclosure tort will serve as the basis of the third element of the right to your digital identity. However, instead of restricting the distribution to an act that simply "gives publicity," [FN291] the scope of this element will focus on how the recording is transferred or disseminated through an electronic medium.

1. Quantifying the Degree of Disclosure

In passing the **Video Voyeurism** Prevention Act of 2004, Congress addressed its concern with the Internet's ability to easily and instantly disseminate voyeuristic photographs to a global audience. [FN292] The House Reports [FN293] noted that violations **367** of privacy are "compounded when the photographs find their way to the Internet . . . [and] the instantaneous distribution capabilities of the Internet, have combined to create a threat to . . . privacy." [FN294] The Congressional Record reported that "the impact of **video voyeurism** on its victims is greatly exacerbated by the Internet. As a result of Internet technology, the photographs that a voyeur captures can be disseminated to a worldwide audience in a matter of seconds." [FN295] Representative Jerse even commented that a victim's "privacy could be violated millions of times" if the image is posted on the Internet. [FN296]

The Louisiana Legislature expressed similar concerns, and recognized the role the Internet plays with modern day Peeping Toms; it imposed criminal liability if a voyeur transmits a voyeuristic photo over the Internet or any other electronic medium. [FN297] Both of these bodies realized the threat that distribution over the Internet poses to privacy, and how spreading information online can make the injury substantially greater. [FN298] These opinions mirrored Justice Carter's observation in Gill that what a couple "did in view of a tiny fraction of the public, does not mean that they consented to observation by the millions or readers of the defendant's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

magazine." [FN299] But the question remains: how to properly measure distribution for the purposes of this tort.

One methodology to quantify the dissemination is to analyze social networks. [FN300] A perfect illustration of this dynamic was discussed in Multimedia WMAZ, Inc. v. **368** Kubach. [FN301] In this case, plaintiff Kubach revealed that he was HIV-positive to sixty close family members and friends. [FN302] Subsequently, he went on a television program to anonymously discuss HIV, but the station failed to properly blur out his face as he requested, making him easily recognizable. [FN303] The plaintiff sued under the tort of public disclosure of private facts, and the television station argued that Kubach lost any expectation of privacy by telling so many of his friends and family about his disease prior to the broadcast. [FN304] The court looked at the social circles involved and decided in favor of the plaintiff, holding that Kubach still expected privacy because he only told people that "cared about him" and would not likely spread the information. [FN305]

Rather than strictly placing a numerical count on how many people view the recording, this element will focus on the social circles, or groups of friends in which information travels. [FN306] The degrees of separation between separate social circles generally prevent private information from spilling out. [FN307] For example, an individual's notoriety in his elementary school will usually not transfer over with him to his university because the social group has changed. Therefore, a court could look to see if the disclosure of private information was something that was approximately contained in a quasi-defined social circle. Or, the court could analyze if the information was disclosed outside the bonds of trust, and spread without concern for relationships and confidence.

Also, a judge could look to the norms about sharing information within a group based on the different types of relationships, such as between a professor and student, or father and son, or employer and employee. [FN308] If the information was contained within a limited circle, it is private, and should be protected. The maxim "what happens in Vegas stays in Vegas" is apt. [FN309] Although these may seem to be difficult determinations, courts constantly perform such **369** a fuzzy analysis when applying the Pinkerton doctrine in identifying conspiracies in criminal law. [FN310]

In addition to social networks, it is important to understand how information is rapidly disseminated throughout the Internet in a phenomenon known as "viral" distributions. [FN311] The Internet, unlike any library or reporting service in the world, is unique in that it allows an almost infinite supply of information to be accessed instantly. Perhaps one of the most famous examples of viral distribution is the "Star Wars Kid," in which a video of an awkward adolescent acting out scenes from the movie Star Wars exploded onto the Internet and was viewed millions of times within weeks of its release. [FN312]

Viral videos are so prominent in our culture that an order from a Justice of the Supreme Court of Texas footnoted to a video on YouTube. [FN313] Once recordings are made of a person in **370** public, the photographs will be stored in perpetuity. [FN314] Similar to the reasoning behind voyeurism statutes that restrict the electronic dissemination of the recorded information, the ability of omniveillance to spread a person's image like a virus makes this novel innovation substantially different from previous newsgathering techniques, and as such, should be treated differently. Although viral videos traditionally capture people in private settings, "like the dog poop girl, you [too] could find photos and information about yourself spreading around the Internet like a virus." [FN315]

2. Application of the Electronic Dissemination Factor to Omniveillance

Indiscriminate and widespread dissemination of recordings from omniveillance is likely to trigger deeper of-

fense and injury. A perfect illustration of this concept is in Daily Times Democrat v. Graham, where a reporter photographed a woman's undergarments when compressed air jets blew up her skirt while exiting a fun house (think Marilyn Monroe). [FN316] It is highly unlikely that the plaintiff would have initiated the suit if someone had just snapped the photograph for personal consumption. However, because it was reproduced in the local newspaper, where all of her family, friends, and colleagues could see it, the offensiveness was magnified and the suit became a necessity. [FN317] In fact, reproducing the photograph in this case is probably more offensive than the initial shock of the snapshot. Another illustration of this phenomenon is the "dog poop girl" *371 previously discussed. [FN318] The original snapshot in the subway was benign and inconsequential. [FN319] However, its viral spread throughout the globe made the invasion and insult to the victim exponentially more injurious. [FN320] This shows that the quantum of propagation is extremely relevant to determine how a person's privacy is violated, especially in the context of omniveillance.

This narrowly tailored test will cut to the heart of omniveillance--widespread, indiscriminate, electronic dissemination that is indefinitely retained and is easy to access. Simply e-mailing a single photograph to an acquaintance, or posting a photograph to a personal web log (blog) would not incur liability under the third element of the right to your digital identity. Under this standard, a tortfeasor must proactively distribute and disseminate vast quantities of recordings through an electronic medium that makes these recordings widely and easily accessible for a prolonged period of time. Factors to consider include the clarity of the recording reproduced, how the recording was spread, how users can access the recording, the degree of detail (including whether facial features are discernible), how easily a specific person can be located, and how long the images are stored. None of these factors are dispositive. Rather, judges will need to develop guidelines to pinpoint precisely the nature of the dissemination in each case.

For an example ripped from the headlines, a fire chief in Florida photographed the breasts of a victim who had crashed into a tree and e-mailed these photographs to several other fire departments. [FN321] In this case, the victim possessed a subjectively and objectively reasonable expectation of privacy not to be photographed, satisfying the first element of this *372 tort. Furthermore, this recording of her breasts would be offensive to a reasonable person, thus satisfying the second element of this tort. However, because the fire chief only distributed the picture to a limited circle of contacts, the quantum of distribution is so minimal that it would not satisfy the third element of this tort. In the event that one of his colleagues widely redistributed these images, this tort still would not apply. The right to your digital identity only applies to individuals or organizations that perform the complete act of making the recording and indiscriminately disseminating it over the Internet. This comports with Bartnicki, where the Supreme Court found a statute barring the disclosure of unlawfully intercepted conversations as unconstitutional because the defendant in the case did not play a role in acquiring the illegal material. [FN322] Thus, neither the fire chief nor his colleagues would be liable, because none of them took the photograph and widely distributed it, unless they were working cooperatively to achieve the massive distribution.

To further illustrate this element, slightly modify the facts of Kubach [FN323] and imagine a person entering an HIV treatment facility, a women's health clinic, or a domestic violence shelter, who is recorded by an omniveiller. Although she may disclose her personal circumstances to a close circle of trustees, she does not intend this disclosure to spread to the entire Internet. [FN324] The Internet greatly magnifies the ability of the recording to spread. For these reasons, courts should look closely at the victim's social circles when determining if a fact is private, or whether it has become public by the disclosure.

It is also important to consider the scienter of the photographer/distributor. Intent to disseminate must exist in order to incur liability. In terms of Internet dissemination, intent can be determined by looking at factors such

as the nature of the distribution, the location on the Internet of the **373** broadcast, the knowledge of the people who can access the information, and the precautions taken to limit or encourage access to the broadcast. For example, a person's intent to limit the information disseminated can be gleaned from posting information on restricted Internet page where viewing is limited by preselection or password. An example of encouraging dissemination would be an omniveiller sending private information to popular Internet sites, where he knows that the editor will reproduce these images for a wider audience. Furthermore, such popular web sites are frequently featured in mainstream media stories that would severely tip the balance in favor of finding liability.

In addition to providing effective remedies for those who have their privacy violated, the dissemination test would also serve as a deterrent to omniveillers. Risk-averse companies would be less willing to indiscriminately disseminate recordings of everyone because this element might tilt the scale towards liability. Conversely, when a recording is only used for a limited use, or is not widely spread, a court is much less likely to find liability. Although drawing such a line may be fuzzy in certain cases, closely analyzing the factors within this element yields an approximate determination that, when taken in connection with the other elements, are useful guideposts to determine liability. Therefore, an optimal level of dissemination can occur with the proper economic incentives.

## D. Element 4--Newsworthiness

The primary concern with any regulation of privacy is the inevitable clash with the First Amendment. As a threshold matter, even though a suit brought by a plaintiff under the right to your digital identity would not involve any governmental actors, it still must comport with the First Amendment. [FN325] Cases from the time of our founding have consistently held that courts were agents of the government, and civil litigation was "subject to [the First Amendment's] constitutional constraint." [FN326] The First Amendment protects **374** omniveillers even though they are not a traditional media entity, because they provide a forum to share information, ideas, and opinions. [FN327] However, the goal of the right to your digital identity is not to prevent companies from creating accurate maps and navigational tools. The issue is whether these maps can include crisp images of people on the streets. As Justice Carter stated in Gill, regarding a magazine article containing a photograph of an embracing couple, "there is no reason why the publisher need invade the privacy of John and Jane Doe for his purpose." [FN328] The magazine article would not have been devalued if the identity of the couple had not been revealed.

Any data privacy regulations that will prevent the spread of private information must pass Constitutional muster and assuage First Amendment criticism. Notwithstanding that burden, the First Amendment is not an absolute right. As well, not all matters are of public concern. The right to your digital identity will propose a newsworthiness test, based on the public disclosure of private facts tort [FN329] that exempts most legitimate matters from incurring liability, and establishes a delicate equilibrium between privacy and freedom of the press.

### 1. Free Speech Is Not an Absolute Right

One of the leading opponents to information privacy regulations is renowned Professor Eugene Volokh. He argues "the difficulty [with regulations] is that the right to information privacy--my right to control your communication of personally identifiable information about me--is a right to have the government stop you from speaking about me." [FN330] To **375** summarize, in order to prevent information about John Doe from being released, Jane Doe's right to free speech must be restricted. This is a very compelling argument. However, viewing this dynamic through the context of omniveillance, certain flaws in the assumptions made behind this argu-

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 25 of 59

ment emerge. This section will show that free speech is not an absolute right, but it is subject to a balancing test, and privacy and free speech can mutually coexist.

  While people do have a limited right to express information about other people, the speaker's right to free speech is not absolute. [FN331] Justice Hugo Black famously stated that free speech is an absolute right, observing that the First Amendment is an "unequivocal command that there shall be no abridgment of the rights of free speech." [FN332] However, Justice Black's minority position is not widely accepted, as not all speech is equally protected with the same level of scrutiny. [FN333] As such, the Supreme Court applies a balancing approach that weighs free speech against other interests. [FN334] For example, the Supreme Court has repeatedly held that libel, slander, and defamation suits, which all abridge the speaker's free speech, are constitutional. [FN335] On the topic of **376** freedom of speech and defamation, the sagacious Benjamin Franklin quipped about the need for balance:

  If by the Liberty of the Press were understood merely the Liberty of discussing the Propriety of Public Measures and political opinions, let us have as much of it as you please.  But if it means the Liberty of affronting, calumniating, and defaming one another, I for my part . . . shall cheerfully consent to exchange my Liberty of Abusing others for the Privilege of not being abus'd [sic] myself. [FN336]

  Furthermore, the press does not have full immunity to publish true facts. [FN337] In many cases the First Amendment will also yield to copyright law. [FN338] Therefore, a balancing test must be used to weigh society's interest in keeping something private against society's interest in learning about that matter. [FN339]

  **377** Acknowledging the balancing approach of the First Amendment, in Dun & Bradstreet, the Supreme Court plurality held that "speech on 'matters of public concern' . . . [is] 'at the heart of the First Amendment's protection' . . . . In contrast, speech on matters of purely private concern is of less First Amendment concern." [FN340] The court reaffirmed this notion in Bartnicki v. Vopper by holding that "privacy concerns give way when balanced against the interest in publishing matters of public importance." [FN341] The logical converse of this holding is that for matters that are not of public importance, privacy interests may be protected. The Supreme Court has had the opportunity to rule on the constitutionality of the public disclosure of private facts tort on First Amendment grounds in cases such as Florida Star. [FN342] But yet, the Supreme Court worked within the tort and considered privacy as a balanced component, as opposed to a casualty, of the First Amendment. Thus, privacy can coexist with the First Amendment, even under modern Supreme Court jurisprudence.

  However, in the few instances where an individual or organization records an image of a non-consenting individual and disseminates it over the Internet with intent to bring those images to a large audience without any concern for newsworthiness, the First Amendment right to free speech may not be able to prevail.  Therefore, because free speech is not absolute, and not all matters are newsworthy, the right to keep some information private remains constitutionally viable, and the right to your digital identity tort can coexist with the First Amendment if it properly balances the competing interests of freedom of the press and privacy.

  2. An Alternate Test to Determine Newsworthiness

  By crafting the original newsworthiness exception to the tort of public disclosure of private facts, Justice Brandeis, **378** who was a dedicated advocate of the First Amendment while on the Supreme Court, was able to balance free speech and privacy. [FN343] However, since Warren and Brandeis's article, the understanding of the newsworthiness exception has been narrowly interpreted and nearly eliminated. The last nail into the coffin of the newsworthiness exception to the public disclosure of private facts torts was Florida Star, where the Su-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

preme Court held that a newspaper could publish the name of a rape victim. [FN344] The Court found that the government should only restrict what the press can print in order to "further a state interest of the highest order." [FN345] Querying what could satisfy this lofty burden, Justice White expressed in dissent, "'[s]hort of homicide, [rape] is the 'ultimate violation of self.'"" [FN346] It stands to reason that if withholding the name of a rape victim does not meet a state interest of the highest order, nothing could ever satisfy this insurmountable threshold. Justice White concluded that the tort of public disclosure was greatly weakened. [FN347]

Scholars have equally eulogized the newsworthiness exception to the public disclosure tort in the aftermath of Florida Star.  Professor Rodney Smolla wrote that the tort exists "more 'in the books' than in practice." [FN348] Professor Richard Murphy describes the tort as "alive, but on life support." [FN349] Professor Jacqueline Rolfs notes that because of the narrow class of information that fulfills the test from Florida Star, the "tort can no longer be an effective tool for protecting individual privacy." [FN350]

Because the Florida Star decision failed to articulate what factors determine whether a matter is newsworthy, [FN351] any meaningful privacy tort cannot rely upon this case to develop a realistic interpretation of what is of public interest *379 when analyzing invasions of privacy. In order to institute the right to your digital identity, privacy jurisprudence would have to catch the current of the rising tide of recent cases and laws that have resuscitated the newsworthiness exception to the tort of public disclosure of private facts. In a leading case to determine whether a subject is newsworthy under California law --Kapellas v. Kofman, the California Supreme Court identified three important factors: (1) "the social value of the facts published," (2) "the depth of the article's intrusion into ostensibly private affairs," and (3) "the extent to which the party voluntarily acceded to a position of public notoriety." [FN352]

The Kapellas balancing test is fashioned after (though it does not cite to) Justice Carter's dissent in Gill, which devised that "private citizens, who desire to be left alone, should have and enjoy a right of privacy so long as they do nothing which can reasonably be said to have news value." [FN353] Because a person's expectation of privacy decreases as he enters the proverbial public spotlight, the Kapellas court found that as the public interest becomes more "substantial," more invasive intrusions into the person's private life are permissible. [FN354] The right to your digital identity tort adopts the three prongs of the Kapellas test to form its newsworthiness exception. This test provides a workable framework to deal with omniveillance that assuages concerns about limiting the press and, at the same time, minimizes violations of privacy by creating liability for events that have de minimis social value.

a. Element 4(a)--Social Value of the Recording Published

The first prong of the newsworthiness exception to the right to your digital identity tort focuses on the social value of the matter recorded.  Justice Holmes proposed that society should strive for the truth and "the best test of truth is the power of the thought to get itself accepted in the competition of the market." [FN355] Under the marketplace of ideas philosophy, *380 freedom of speech allows society to seek the truth. [FN356] However, not all "truths" are created equal. Trivial pieces of information with negligible societal values do not deserve the same protection in the marketplace of ideas that more worthy items do. [FN357] As Samuel Warren and Justice Brandeis observed over a century ago, "[t]he press is overstepping in every direction the obvious bounds of propriety and of decency." [FN358]

The difficulty in drawing the line between public concern and private concern is of the utmost difficulty.  According to Professor Solove, "what is of interest to most of society is not the same question as what is

of legitimate public concern . . . . [T]he media should not have a monopoly on determining what is of public concern." [FN359] However, classifying too many events as private could have a chilling effect on the press, as reporters might become afraid to publish legitimate stories out of fear of liability.

In response to this fear, the Supreme Court has taken steps to resolve this dilemma with narrow strikes by applying "limited principles" to the specific facts of each case, noting that "the future may bring scenarios which prudence counsels our not resolving anticipatorily." [FN360] However, aside from these jurisprudential vagaries, there is no definitive constitutional standard to determine the social value of a matter. [FN361] Although this a difficult line to draw, it is a necessity for a free society that values the press and privacy to establish a rule. In dissent in Gertz, Justice Brennan noted that determining whether an issue is of "general or public interest" (a similar inquiry to newsworthiness) "would not always be easy . . . [b]ut surely the courts, the ultimate arbiters of all disputes concerning clashes of constitutional values, would only be performing one of their traditional **381 functions in undertaking this duty." [FN362] Refusing to draw a distinction is to abdicate privacy protections and tip the scales entirely towards the media.

There are several factors a court can use to determine the social value of a recording. The California Supreme Court gave further light to this first prong in Shulman v. Group W Productions, when it held that something is newsworthy if some reasonable members of the community have a legitimate interest in the topic. [FN363] Another method is to apply community standards of decency. [FN364] Others suggest limiting it to a "valid and valuable public interest" in the item's publication. [FN365] Samuel Warren and Justice Brandeis defined newsworthiness as that "which makes [a person's] doings legitimate matters of public investigation" [FN366] and sought to protect the privacy of "those persons with whose affairs the community has no legitimate concern, from being dragged into an undesirable and undesired publicity." [FN367] Professor Solove contends that "free speech is most valuable when it contributes to public discussion on issues of policy and politics. Under this view, speech of private concern is relatively unimportant. Reporting people's secrets rarely contributes much to politics." [FN368]

These are very loose standards that have to be carefully evaluated on a case-by-case basis, in light of the factual situations, in order to ensure that the freedom of the press is **382 preserved. Yet none of these standards will allow omniveillers to cloak and indemnify themselves behind the newsworthiness exception to indiscriminately reproduce images of average people engaged in private and insignificant activities. Because this test will be enforced as a common-law tort, any of the social value tests, or combination of tests mentioned above, can be used to determine newsworthiness.

Most of the images recorded and disseminated by omniveillers would generally not represent anything unique or special under any of the standards discussed. The reason is that these images do not have a social value. There may be instances when a person is photographed in public, perhaps participating in a parade, a festival, a press conference, or a crime. These recording would possess adequate social value, and would satisfy the first prong of the newsworthiness test. But, a photograph of a dog defecating in a subway car, or a photograph of a non-famous person walking into an adult bookstore, would have negligible social value under any standard, and likely fail this prong of the test.

Unlike the public disclosure of private facts tort, under the right to your digital identity, the newsworthiness of a matter is also a factor of how widely a recording is distributed. [FN369] If a fact is kept within a relatively small circle, it need not be particularly newsworthy, as friends frequently share minor embarrassing stories. However, when a recording is widely spread, the quantum of newsworthiness must increase commensurately, as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R   Document 36-3   Filed 02/08/10   Page 28 of 59

the social networks can no longer contain a small story. For example, if several friends discussed seeing a girl on a subway refuse to clean up her dog's waste, because the information is kept in a small circle, the lack of social value would not incur liability.

Images already captured by the current iteration of Street View include a man wearing a wedding ring walking out of adult's club in broad daylight, two woman sunbathing in bikinis near Stanford University, a woman's undergarments exposed while leaning into a car, a gentleman who was caught putting his fingers where they probably should not have been, and a man creeping into the shadows of an adult book store. [FN370] These regular, mundane, human acts **383** have no social value. Thus, recordings of regular people doing average things will likely incur liability under this prong of the newsworthiness exception.

b. Element 4(b)--Depth of Intrusion into Private Matters

The second prong of the newsworthiness exception to the right to your digital identity focuses on the depth of the intrusion into private matters. While the public disclosure of private facts tort only makes the threshold judgment of whether an item is newsworthy, [FN371] the balancing test from Kapellas peers into the content, and factors the subject matter of the recording into the calculus of whether a person's privacy was invaded. By focusing on the nature of the activity, the Kapellas test can be more faithfully applied to provide society access to newsworthy content, but leave purely private matters out of the spotlight. In order to analyze whether an occurrence is ostensibly private, it is useful to look at the California paparazzi statute, which assesses liability based on whether the recorded event is a "personal or familial activity." [FN372]

Under the California paparazzi statute, when the tortfeasor attempts to capture an image of the victim who is "engaging in a personal or familial activity" the defendant is liable. [FN373] So as not to create an absolute bar on photographing legitimate matters of public interest, the legislature limited "personal or familial activity" to include "intimate details of the plaintiff's personal life, interactions with the plaintiff's family or significant others, or other aspects of plaintiff's private affairs or concerns." [FN374]

As applied to omniveillance, this analysis is very important because matters may often seem public at a first glance, but deeper probing reveals that they are quite private. Factors to consider when making this determination include whether the victim was with friends of family, whether the recording is of an intimate matter, or if society generally recognizes that matter as private. For this reason, a simple **384** factual inquiry into the nature of the recorded activity can shine light on whether the matter is actually newsworthy, or is it just "personal or familial activity." If such a recording is only personal or familial, this second prong of the newsworthiness test will favor liability. For example, a person simply walking into a regular building would be a public matter. However, a young woman walking into a health clinic would more likely result in the omniveiller incurring liability.

c. Element 4(c)--Voluntary Ascension to Position of Public Notoriety

The third prong of the newsworthiness exception to the right to your digital identity is one of the key factors distinguishing it from the public disclosure of private facts tort. In Carlisle v. Fawcett Publications, the court found that "there is a public interest which attaches to people who by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." [FN375] In essence, the court suggested that a Faustian bargain exists for those who seek fame, as fame is a traded for the right to be let alone. This notion accords well with Warren and Brandeis, who noted that "men of the first class" make "their doings legitimate matters of public investigation" and "have renounced the right to live their lives

screened from public observation." [FN376]

However, not everyone seeks fame--especially in the case of omniveillance. Distinguishing between those who are genuinely in the public eye and those who just want to be let alone, Justice Carter sought to have the public disclosure of private facts tort "protect the right of the 90% who do not desire publicity or notoriety and who may be offended by publications such as that here involved." [FN377] It is inevitable in **385** society that someone who did not aspire to that fame is occasionally caught in the public spotlight. As Andy Warhol noted, in the future, everyone will be world-famous for fifteen minutes. [FN378] When a person was involved in a car accident, was a witness to a crime, caught a record breaking baseball at a game, or was photographed in the background of a parade, there is little that can be done to avoid being thrust into the public eye.

In Shulman, a victim of a gruesome car accident, who was videotaped by a reality TV show after her accident, lost a public disclosure of private facts suit because the court found that by getting into a car accident, she assumed a position of notoriety. [FN379] By recognizing that the victim of the crash assumed a position of fame, it is significant that the court implicitly recognized that all people need to actively or passively assume notoriety. Fame cannot be presumed as a natural state.

Dean Prosser argued that people "assumed the risk" of being photographed when in public. [FN380] According to the Restatement (Second) of Torts, "[t]here are other individuals who have not sought publicity or consented to it, but through their own conduct or otherwise have become a legitimate subject of public interest. They have, in other words, become 'news.'" [FN381] Dean Prosser suggested that the court should defer to the editor's judgments, and in the case of traditional media outlets, sheer economics dictated that only a limited number of high profile events could possibly be covered. [FN382] **386** Thus, the editor would publish some stories at the opportunity cost of not publishing others. Mundane human acts would never be published at the opportunity cost of exciting human acts, such as car accidents or a celebrity happening. The editor's selection implicitly attaches a value to anything that is published, and provides a reliable basis for judges to rely on. This deference in the context of omniveillance is untenable for several reasons.

First, in the case of omniveillance, everyone in a given location is photographed without any concern for whether something important is occurring. The victims of this unblinking eye are thrust into the limelight without any reason or cause. There is absolutely no voluntary or even involuntary ascension to fame. Second, the assumption of risk requires a person to have "full knowledge of the risks," and to disregard the danger. [FN383] Therefore, the assumption of the risk argument is a non sequitur in the context of omniveillance, because it is impossible to avoid the limelight. Pervasive and indiscriminate omniveillance tools amass vast quantities of information about anyone who has done nothing to put himself in the limelight, with absolutely no discretion. The cameras are always rolling, and a person never knows when he will be photographed. In essence, you cannot stay away from it. Everyone gets their fifteen minutes of fame, whether they want it or not.

Third, there is a difference between volunteering to be seen in public and volunteering to be recorded in public. [FN384] As Justice Carter observed in Gill, there is a distinction between what is viewable in public and what is viewable by reproduction, as what the photographed couple chose to do "in view of a tiny fraction of the public, does not mean that they consented to observation by the millions or readers of the defendant's magazine." [FN385] A "person does not automatically **387** make public everything he does in a public place." [FN386] It is not enough to engage in any conduct and assume some risk. Rather, in order to qualify as assumption of the risk for negligence under the Restatement of Torts, [FN387] the plaintiff must assume the particular risk at issue. [FN388] In the case of omniveillance, when a person simply goes outside, they are assuming the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

risk that someone will see them. However, unaware that a secret surveillance apparatus is lurking, such a person does not assume that particular risk of being recorded. According to the Restatement (Second) of Torts, assumption of risk specifically requires a knowledge element that necessitates that the plaintiff "must not only be aware of the facts which create the danger, but must also appreciate the danger itself and the nature, character, and extent which make it unreasonable." [FN389] This standard thus does not apply in the context of omniveillance.

Although a celebrity walking down Rodeo Drive in Beverly Hills followed by a throng of paparazzi can be said to have assumed the risk of being recorded, the same cannot be said when an average person is surreptitiously photographed by an unmarked vehicle or a hidden camera on a rooftop. Ubiquitous and omnipresent surveillance essentially prevents people from avoiding this spotlight. While it may be possible to escape traditional news media, and give a simple "no comment" response to an inquisitive reporter, when a person is being recorded without their knowledge, an abstention from the media becomes an impossible feat. And, contrary to Andy Warhol's time, when finding an old story involved digging through a dusty library or scanning through microfiche, the fame that omniveillance creates will last much longer than fifteen minutes. Rather, these images are stored in perpetuity on the Internet for anyone to find.

In the case of omniveillance, the people who are photographed did little more than walk outside or open their curtains. They are not involved in a newsworthy event that they voluntarily or involuntarily became a part of. In *388 addition, there is no easy way to determine if one is even photographed, as there are no warnings displayed during the recording. Under these circumstances, it is difficult to interact in society without a reasonable apprehension that omniveillance will capture your image for eternity. Because people are not able to avoid this recording, it is wrong to treat them in the same vein as people who are thrust into the limelight because of something that happened to them.

Strictly applying the Restatement's approach, the only way to avoid assuming the risk is to lock your door, shut your curtains, and live a concealed life within your own property. [FN390] In the context of omniveillance, society is presented with a Hobson's choice. People can either live a hermetic life beyond the eye of omniveillance, or live a life in public and have no privacy at all. Recognizing the value of privacy and how it promotes free speech and expression, [FN391] this outcome is quite undesirable, and should not be promoted. Therefore, because most of the people who are photographed by omniveillance cannot assume the risk, their notoriety is not voluntary, and the third prong of the newsworthiness exception to the right to your digital identity will not be met.

### 3. Omniveillance Applied under the First Amendment

By properly weighing the four factors in the right to your digital identity tort, the equilibrium between free speech and privacy can be preserved. By limiting the right to your digital identity to omniveillance, most plaintiffs who sue traditional forms of media, namely newspapers, televisions, and magazines, will not prevail because they usually broadcast a specific recording for a limited purpose. Plaintiffs who sue organizations that use limited-purpose recording devices, namely closed-circuit surveillance cameras in public places that do not indiscriminately disseminate a recorded image worldwide, will likely not prevail. Finally, plaintiffs suing individuals or organizations that use quasi-public surveillance tools such as traffic-jam cameras, simple web cameras, and singular digital cameras will not prevail, because the images taken are generally not spread infinitely throughout the Internet. Therefore, if a journalist records *389 and disseminates a recording of a bank robbery or an assassination, it is likely that liability would be inappropriate. Conversely, if a pervasive public monitoring system recorded and distributed over the Internet a video of a person whose pants fell down, liability might be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

appropriate. This flexible process optimizes the incentive to collect newsworthy material, but, at the same time, protects people's inviolate right to privacy.

## E. Common-Law Enforcement

It is essential to strike the proper balance when crafting an effective privacy tort that is not over-inclusive, but at the same time not under-inclusive. [FN392] Despite the popularity of the **Video Voyeurism** Prevention Act of 2004, [FN393] the federal legislation left much to be desired and many states passed subsequent amendments and additions to that law. States like Washington passed more relaxed legislation, while states like Louisiana took more draconian measures. [FN394] Rather than proposing omnibus federal privacy legislation, each state should have the option to adopt their own interpretation of this tort through the common law, [FN395] utilizing judicial enforcement, which tends to parallel public conceptions. [FN396] By allowing the powers of federalism [FN397] to play out, privacy interests can be customized and personalized based on specific characteristics of the particular state. [FN398] California **\*390** can have a lenient standard to deal with the large number of celebrities, while a smaller state like Iowa or New Hampshire can have a stricter standard to deal with the lack of newsworthy events, except during the presidential primaries, when more lax standards can be used. Ideally, judges can fine-tune the boundaries of the right to meet the needs of the citizenry. Allowing localities to differently define privacy rights is supported by the Supreme Court's jurisprudence on defining obscenity according to local community standards of decency. [FN399] I have not written this article so that states or judges adopt this tort in toto. Rather, the purpose of this article is to allow jurists to look to the factors outlined, and develop an analysis in order to further pursue privacy protections. [FN400]

**\*391** Determinative queries can include questions such as what is the emerging technology du jour, what are the cultural and normative values of the people with respect to privacy, how would a reasonable person act in that state, what is considered offensive, and how embedded is technology in the society. Such a flexible standard, rather than an ironclad federal bill, will allow for changes to society so that this tort remains viable, in contrast with Dean Prosser's privacy torts, which have stagnated for decades because they were so rigid. In most cases, the desired remedy by the victim would be specific performance--removal of the photograph from the Internet. To avoid suits, risk-averse companies would likely settle when reasonable requests to remove an offensive image are made. [FN401] Compensatory damages can be calculated based on principles similar to other torts, including harm suffered from intentional infliction of emotional distress, as well as slander and libel suits. [FN402] Unlike other Internet issues, where it is hard to assert jurisdiction because of the borderless nature of electronic communications, [FN403] in these cases there is a tangible and physical act occurring in a state that establishes personal contact--the creation of a recording. Choice of law can be determined using a place of the injury rule, applying the law of the jurisdiction where the "plaintiff was when his feelings were wounded." [FN404]

## CONCLUSION

With technology like Google Street View secretly and indiscriminately photographing people and reproducing these images over the Internet, the specter of omniveillance is looming on the horizon. This article proposes the right to your digital identity, a tort to balance privacy rights with free speech, and provide a remedy for victims of omniveillance.

The tort has four factors that are balanced to create a **\*392** workable equilibrium between privacy and free

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

speech. This test emerged from existing privacy torts, borrowing from many areas of the law to develop a work-able framework to remedy victims of omniveillance. The first element modifies the tort of intrusion upon seclusion and adopts a reasonable expectation of privacy standard. The second element serves as a reflection on society's changing perceptions of offensiveness, lowering the standard from highly offensive to offensive, mirroring contemporary sensibilities. The third element of the tort focuses on the new, more pervasive methods of electronic data dissemination over social networks and viral Internet distributions, and accords greater liability to larger and more indiscriminate distribution. The fourth element weighs the newsworthiness exception from the tort of public disclosure of private facts against the level of intrusion into an individual's privacy, attempting to strike a fair balance so that privacy has a chance to outweigh free speech when applied in our courts. Enforced as a common-law tort, where each state can define the contours of the tort to meet its citizens' specific needs, the right to your digital identity is a viable remedy for victims of omniveillance.

[FNa1]. George Mason University School of Law, Juris Doctor Candidate, May 2009; Law Clerk for the Honorable Kim R. Gibson, U.S. District Court for the Western District of Pennsylvania, 2009-2010; Articles Editor, George Mason Law Review, 2008-2009; Pennsylvania State University, B.S., Information, Sciences, and Technology, December 2005, High Distinction. I thank my family for their support while writing this article. I dedicate this article to James Madison.

[FN1]. Miguel Helft, Google Photos Stir a Debate over Privacy, N.Y. Times, June 1, 2007, at C1, available at http://www.nytimes.com/2007/06/01/technology/01private.html.

[FN2]. See id.

[FN3]. See id.

[FN4]. See id.

[FN5]. See id.

[FN6]. See Restatement (Second) of Torts § 652D cmt. h (1977).

[FN7]. See Restatement (Second) of Torts § 652B cmt. c (1977).

[FN8]. Cal. Civ. Code § 1708.8(b) (Deering 2005) (imposing harsher civil liability for members of the paparazzi who overstep their boundaries in following celebrities).

[FN9]. Fla. Star v. B.J.F., 491 U.S. 524 (1989).

[FN10]. See Richard S. Murphy, Property Rights in Personal Information: An Economic Defense of Privacy, 84 Geo. L.J. 2381, 2388 (1996) (arguing that after Florida Star, the tort of public disclosure of private fact tort is "alive, but on life support").

[FN11]. Id.

[FN12]. See Daniel J. Solove, The Future of Reputation 139-40 (2007).

[FN13]. Id. at 140; see The Federalist.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN14]. Solove, supra note 12, at 140.

[FN15]. See Michael Waterstone, Civil Rights and the Administration of Elections--toward Secret Ballots and Polling Place Access, 8 J. Gender Race & Just. 101, 106 (2004).

[FN16]. Max Farrand, Introduction to 1 The Records of the Federal Convention of 1787, at xi (Max Farrand ed., Yale Univ. Press rev. ed. 1937) (1819).

[FN17]. Charles Warren, The Making of the Constitution 134-39 (Harvard Univ. Press 1947) (1928).

[FN18]. Solove, supra note 12, at 139-40.

[FN19]. Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890).

[FN20]. See, e.g., Solove, supra note 12, at 108 (discussing the significance of the article to privacy law).

[FN21]. Fla. Star v. B.J.F., 491 U.S. 524, 550 (1989) (White, J., dissenting).

[FN22]. See Robert Ellis Smith, Ben Franklin's Web Site: Privacy and Curiosity from Plymouth Rock to the Internet 124 (2000) ("[I]n the years before the development of photography in the mid-1800's, even mirrors were not universal in British and American life. Imagine the realization that for the first time the very essence of your being--your visage--could be captured by someone else--used and controlled by someone else."); Robert E. Mensel, "Kodakers Lying in Wait": Amateur Photography and the Right of Privacy in New York, 43 Am. Q. 24, 28 (1991) (noting that the widespread use of the Eastman Kodak snap cameras in the late nineteenth century started a phenomenon which allowed a new breed of photographers to take photographs instantly without consent of the subjects, whereas in the past subjects of photographs had to sit for prolonged periods of time).

[FN23]. Warren & Brandeis, supra note 19, at 195.

[FN24]. Id. at 211.

[FN25]. Id. at 195, 197.

[FN26]. Id. at 195 (quoting Judge Cooley).

[FN27]. Id. at 198.

[FN28]. Id. at 211.

[FN29]. Warren & Brandeis, supra note 19, at 214.

[FN30]. Id. at 215.

[FN31]. Id. at 215-16.

[FN32]. Id. at 214.

[FN33]. Id. at 216.

[FN34]. See Benjamin E. Bratman, Brandeis and Warren's The Right to Privacy and the Birth of the Right to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Privacy, 69 Tenn. L. Rev. 623, 650 (2002) (noting that Warren and Brandeis's article "get[s] the credit for spawning a mini-revolution in the law, a revolution that eventually spread throughout the United States and throughout several fields of law to give us a wide-ranging right to privacy").

[FN35]. See, e.g., Pasevich v. New England Life Ins. Co., 50 S.E. 68, 70 (Ga. 1905) ("The body of a person cannot be put on exhibition at any time or at any place without his consent. The right of one to exhibit himself to the public at all proper times, in all proper places, and in a proper manner is embraced within the right of personal liberty. The right to withdraw from the public gaze at such times as a person may see fit, when his presence in public is not demanded by an rule of law, is also embraced within the right of personal liberty ... [the use of a person's identity against his will makes him] under the control of another ... [so that] he is no longer free, and that he is in reality a slave.").

[FN36]. William L. Prosser, Privacy, 48 Cal. L. Rev. 383, 389 (1960).

[FN37]. Restatement (Second) of Torts § 652D (1977) ("One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."). Compare Restatement (Second) of Torts § 652D cmt. c (1977) (explaining that the Restatement sets a very high standard to determine what is highly offensive, by commenting that "[t]he ordinary reasonable man does not take offense at a report in a newspaper that he has returned from a visit, gone camping in the woods or given a party at his house for his friends") with Warren & Brandeis, supra note 19, at 195 (seeking to provide a "remedy for the unauthorized circulation of portraits of private persons," who quite possibly could have gone camping in the woods).

[FN38]. Restatement (Second) of Torts § 652B (1977). Intrusion upon seclusion as codified in the Restatement occurs when "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Id. The Restatement sets a very high standard for an intrusion upon seclusion in public in that "there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters." Restatement (Second) of Torts §652B cmt. c (1977). But see Galella v. Onassis, 487 F.2d 986, 995 (2d Cir. 1973) (holding that a paparazzo violated the privacy of Mrs. Onassis "[w]hen weighed against the de minimis public importance of the daily activities of the defendant, Galella's [the paparazzo's] constant surveillance, his obtrusive and intruding presence, was unwarranted and unreasonable"); Dietemann v. Time, Inc., 449 F.2d 245, 248 (9th Cir. 1971) ("[W]e have little difficulty in concluding that clandestine photography of the plaintiff in his den ... resulting in his emotional distress warrants recovery for invasion of privacy in California."); Nader v. Gen. Motors Corp., 255 N.E.2d 765, 771 (N.Y. 1970) (holding that "[a] person does not automatically make public everything he does merely by being in a public place, and the mere fact that Nader was in a bank did not give anyone the right to discover the amount of money he was withdrawing").

[FN39]. Restatement (Second) of Torts § 652C (1977) ("One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for the invasion of privacy.").

[FN40]. Restatement (Second) of Torts § 652E (1977) ("One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.").

[FN41]. Prosser, supra note 36, at 422. Prosser criticized the development of the privacy laws as going on "without any plan, without much realization of what is happening or its significance, and without any consideration of its danger." Id. There had been little "attempt to inquire what interests we are protecting, and against what kind of conduct." Id. at 423. He feared that the courts "have accepted a power of censorship over what the public may be permitted to read, extending very much beyond that which they have always had under the law of defamation." Id. (emphasis added). While Prosser stopped short of calling the privacy torts wrong, he concluded that it is "high time that we realize what we are doing, and give some consideration to the question of where, if anywhere, we are to call a halt." Id.

[FN42]. Neil M. Richards & Daniel J. Solove, Privacy's Other Path: Recovering the Law of Confidentiality, 96 Geo. L.J. 123, 149 (2007).

[FN43]. Id. at 152-53.

[FN44]. See Andrew J. McClurg, Kiss and Tell: Protecting Intimate Relationship Privacy through Implied Contracts of Confidentiality, 74 U. Cin. L. Rev. 887, 897 (2006) ("At least forty-five states have adopted one or more of the privacy torts, nearly always following the Restatement definitions.").

[FN45]. See, e.g., Dempsey v. Nat'l Enquirer, 702 F. Supp. 927, 931 (D. Me. 1988) (citing Restatement (Second) of Torts § 652B cmt. c (1977)).

[FN46]. See Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953).

[FN47]. See e.g., id. at 443.

[FN48]. Fla. Star v. B.J.F., 491 U.S. 524, 550 (1989) (White, J., dissenting) (discussing the majority opinion which held that "only 'a state interest of the highest order' permits the state to penalize the publication of truthful information").

[FN49]. Id.

[FN50]. Gill, 253 P.2d 441.

[FN51]. Id. at 442.

[FN52]. Id.

[FN53]. Id.

[FN54]. Id. at 444 (citing Melvin v. Reid, 297 P. 91, 93 (Cal. Ct. App. 1931)).

[FN55]. Id. at 443.

[FN56]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 443-44 (Cal. 1953).

[FN57]. Id. at 443 (quoting Warren & Brandeis, supra note 19, at 215).

49 Santa Clara L. Rev. 313

[FN58]. Warren & Brandeis, supra note 19, at 211.

[FN59]. Gill, 253 P.2d at 446 (Carter, J., dissenting).

[FN60]. Id.

[FN61]. Id. at 447.

[FN62]. Id.

[FN63]. Id.

[FN64]. Id. at 446.

[FN65]. See infra Part II.A.

[FN66]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (Carter, J., dissenting).

[FN67]. See Galella v. Onassis, 487 F.2d 986, 994-95 (2d Cir. 1973) (quoting Nader v. General Motors Corp., 255 N.E. 2d 765, 771 (N.Y. 1970)), aff'g in part, rev'g in part, 353 F. Supp. 196 (S.D.N.Y. 1973).

[FN68]. Galella v. Onassis, 353 F. Supp. 196, 228 (S.D.N.Y. 1973), aff'd in part, rev'd in part, 487 F.2d 986 (2d Cir. 1973).

[FN69]. See, e.g., Kapellas v. Kofman, 459 P.2d 912, 922-24 (Cal. 1969). But cf. Daily Times Democrat v. Graham, 162 So. 2d 474, 477 (Ala. 1964) (holding, in a case where a woman's underwear was photographed while a compressed air jet in a fun-house blew up her skirt, that the photograph had "nothing of legitimate news value ... [and] disclose[d] nothing as to which the public is entitled to be informed").

[FN70]. Fla. Star v. B.J.F., 491 U.S. 524 (1989) (holding that the publication of a rape victim's name does not violate her privacy because the information was available to the public, and finding that the government could only regulate what a newspaper could publish in order to "further a state interest of the highest order").

[FN71]. Id. at 550-51 (White, J., dissenting). Justice White's dissent noted that the majority accorded "too little weight to B.J.F.'s side of the equation, and too much to the other" and lamenting the obliteration of the tort of publication of private facts, which was "one of the most noteworthy legal inventions of the 20th century" but was now decimated. Id. at 542-43 (quoting Coker v. Georgia, 433 U.S. 584, 597 (1977) (observing that "[s]hort of homicide, [rape] is the 'ultimate violation of self'" and that little could overcome this high threshold)); see Murphy, supra note 10, at 2388 (describing the privacy torts as "alive, but on life support"); Jacqueline R. Rolfs, The Florida Star v. B.J.F.: The Beginning of the End for the Tort of Public Disclosure, 1990 Wis. L. Rev. 1107, 1128 (observing that the public disclosure of private facts "tort can no longer be an effective tool for protecting individual privacy"); Rodney A. Smolla, Privacy and the First Amendment Right to Gather News, 67 Geo. Wash. L. Rev. 1097, 1101 (1999) (noting that the disclosure tort exists "more 'in the books' than in practice"); see also Daniel J. Solove, Marc Rotenberg & Paul M. Schwartz, Information Privacy Law 635 (2d ed. 2006). Scott McNealy, CEO of Sun Microsystems eulogized this perceived death of privacy by saying, "[y]ou already have zero privacy. Get over it." Solove, Rotenberg & Schwartz, supra, at 635.

[FN72]. See, e.g., Andrew Jay McClurg, Bringing Privacy Law out of the Closet: A Tort Theory of Liability for

Intrusions in Public Places, 73 N.C. L. Rev. 989, 1041-43 (1995) (observing that "a photograph permits dissemination of an image not just to a larger audience, but to different audiences than the subject intended ... [as] conduct which would be appropriate for one environment may be inappropriate or embarrassing in another"). The concept of context is very prominent throughout Supreme Court jurisprudence, including in criminal law. See, e.g., Williamson v. United States, 512 U.S. 594, 603 (1994) ("Moreover, whether a statement is self-inculpatory or not can only be determined by viewing it in context.").

[FN73]. Philip Roth, In Defense of Intimacy: Milan Kundera's Private Lives, Village Voice, June 26, 1984, at 42 ("[A]ny man who was the same in both public and intimate life would be a monster. He would be without spontaneity in his private life and without responsibility in his public life.").

[FN74]. Alan F. Westin, Science, Privacy, and Freedom: Issues and Proposals for the 1970s, in Privacy and Freedom 33 (1967).

[FN75]. See Ruth Gavison, Privacy and the Limits of Law, 89 Yale L.J. 421, 432-33 (1980).

[FN76]. See infra Part III.C.

[FN77]. Hubert H. Humphrey, Foreword to Edward V. Long, The Intruders, at viii (1967) ("We act differently if we believe we are being observed. If we can never be sure whether or not we are being watched and listened to, all our actions will be altered and our very character will change.").

[FN78]. See Joseph Bensman & Robert Lilienfeld, Between Public and Private: Lost Boundaries of the Self 174 (1979) (explaining that in public, individuals strive to meet the expectations of society).

[FN79]. See, e.g., Jeffrey Rosen, The Naked Crowd 186 (2004) (noting that people generally try to adopt the "'middle region' behavior in public: a blend of the formal front stage, and the informal back stage, with a bias towards self-conscious informality").

[FN80]. Kreativrauschen, http:// www.kreativrauschen.com/blog/2008/06/04/data-retention-effectively-changes-the-behavior-of-citizens-in-germ any/ (June 2008). Although this study was performed on German citizens, and focused on government and not private surveillance, id., the results support this article's thesis that people moderate, modify, and abstain from certain behaviors when they are being monitored.

[FN81]. See also Sean M. Scott, The Hidden First Amendment Values of Privacy, 71 Wash. L. Rev. 683, 723 (1996) ("[T]he right to privacy and the First Amendment both serve the same interest in individual autonomy.").

[FN82]. See, e.g., Solove, supra note 12, at 72 ("Without privacy, people might experience significant unease at everything they do, constantly wondering how others might interpret their actions. Innocent behavior might appear suspicious out of context.").

[FN83]. See, e.g., id. at 4, 130 ("As social reputation-shaping practices such as gossip and shaming migrate to the Internet, they are being transformed in significant ways. Information that was once scattered, forgettable, and localized is becoming permanent and searchable. Ironically, the free flow of information threatens to undermine our freedom in the future.").

[FN84]. Stephen Shankland, Google's U.S. Search Share Nears 70 Percent, CNET, July 15, 2008, ht-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

tp://news.cnet.com/8301-1023_3-9991866-93.html? tag=nefd.top.

[FN85]. Scott D. Harris, Dictionary Adds Verb: To Google, San Jose Mercury News, July 7, 2006, at A1.

[FN86]. Jeff Mason, McCain Says Using Google to Vet VP Candidates, Reuters, June 9, 2008, ht-tp://reuters.com/article/internetnews/idUSN0926840220080609.

[FN87]. Google Maps, http://maps.google.com/ (last visited Sept. 14, 2008). Although Google Street View is not the only provider of this type of service, as Yahoo!, Microsoft, and others have proposed similar services, it is by far the most prominent and sophisticated. Therefore, this article will primarily focus on Google's offerings. Google Earth has also been used to map movement of refugees around the world. Google Earth Maps Refugee Crises, Associated Press, Apr. 8, 2008, http://www.baynews9.com/content/36/2008/4/8/338441.html.

[FN88]. Jesse Leavenworth, WEBCAMMED!; Google Takes Man on the Street to New Places, Hous. Chron., July 1, 2007, § Star, at 5.

[FN89]. Id.

[FN90]. Id.

[FN91]. It is not certain how recently these photographs have been taken, or how often they will be updated. The news ticker in Times Square flashed a headline that former Green Bay Packers quarterback Brett Favre had just thrown his 400th touchdown. Based on this fact, Google photographed Manhattan on approximately September 23, 2006.

[FN92]. Leavenworth, supra note 88.

[FN93]. See Google Maps, http://maps.google.com/ (last visited Oct. 5, 2008).

[FN94]. Posting of Ryan Singel, to Wired Blog Network, http://blog.wired.com/27bstroke6/2007/05/request_for_urb.html (May 30, 2007, 4:31:30 PST).

[FN95]. David Ljunggren, Google Eyes Canada Rollout of Discreet Street View, Reuters, Sept. 24, 2007, http://www.reuters.com/article/governmentFilingsNews/idUSN2430696920070924.

[FN96]. Asher Moses, Google's Candid Camera Snaps Australia, The Age (Austl.), Nov. 23, 2007, ht-tp://www.theage.com.au/news/web/googles-candid-camera-snaps-australia/2007/11/23/1195753275851.html. Interestingly, shortly after Google Street View was announced in Australia, The Australian (a newspaper) requested addresses of Google employees living in Australia, so the paper could publish pictures of their homes. Exhibiting somewhat of a double standard, Google refused. Anthony Klan, Google Execs Reveal Double Standards, Australian, Apr. 12, 2008, http:// www.australianit.news.com.au/story/0,25197,23535299-15306,00.html.

[FN97]. Peter Sayer, Google Takes Street View Snaps in Paris; Lawsuits May Follow, The Industry Standard, May 9, 2008, http://www.thestandard.com/news/2008/05/09/google-takes-street-view-snaps-paris-lawsuits-may-follow.

[FN98]. Posting of Stephen Shankland to CNET News Blog, http://www.news.com/8301-10784_3-9924711-7.html (Apr. 21, 2008, 11:24 PDT).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN99]. Google Faces 'Street View Block', BBC, July 4, 2008, http:// news.bbc.co.uk/2/hi/technology/7488524.stm.

[FN100]. Tom Pullar-Strecker, Google's Street View in NZ Soon, Stuff.co.nz, Aug. 4, 2008, http://www.stuff.co.nz/stuff/4642693a28.html.

[FN101]. Posting of Owen Thomas to Valleywag, http:// valley-wag.com/357517/sergey-stymied-prius-doesnt-work-for-google-street-view (Feb. 19, 2008, 13:28).

[FN102]. Mark John, EU Says Google Map Images Could Be a Problem, Reuters, May 15, 2008, http://www.reuters.com/article/technologyNews/idUSL1593011920080515?                   feed-Type=RSS&feedName=technologyNews&rpc=22&sp=true.

[FN103]. See CBS Evening News, Google's New Street View Being Criticized as an Invasion of Privacy (CBS news broadcast June 11, 2007) (reporting that although Street View has not done "anything illegal here," it makes people feel "icky and uncomfortable" and that "[a]lthough we all recognize the risk that we might be watched or photographed moving about in public, we all assume some level of anonymity"); Catharine Holahan, Google Is Watching You, Bus. Wk. Online, June 25, 2007, http:// www.businessweek.com/technology/content/jun2007/tc20070622_338015.htm; Leavenworth, supra note 88 ("There's a big difference between a person taking a photo on the street and the Internet's largest corporation swallowing up all the data that it can capture."); Feng Zeng Kun, Street View Zooms in on Privacy Issues, The Straits Times (Sing.), July 10, 2007, http:// www.asiaone.com/print/digital/features/story/A1story20070711-17954.html ("Being outed as a smoker is a fairly mild embarrassment ... but what if someone was walking out of an Alcoholics Anonymous meeting?").

[FN104]. Posting of Stan Schroeder to Mashable, http:// mash-able.com/2007/05/31/top-15-google-street-view-sightings/ (May 31, 2007, 11:05 PDT).

[FN105]. News.com.au, Gallery: The Best of Google Street View, http:// www.news.com.au/technology/gallery/0,25793,5031914-5007151-13,00.html (last visited Sept. 15, 2008).

[FN106]. Google Sightseeing, Half Naked Sunbathing Girls on Google Street View, May 31, 2007, http://googlesightseeing.com/2007/05/31/half-naked-sunbathing-girls-on-google-street-view/.

[FN107]. News.com.au, Gallery: The Best of Google Street View, http:// www.news.com.au/technology/gallery/0,25793,5031914-5007151-4,00.html (last visited Oct. 5, 2008).

[FN108]. News.com.au, Gallery: The Best of Google Street View, http:// www.news.com.au/technology/gallery/0,25793,5031914-5007151-10,00.html (last visited Oct. 5, 2008).

[FN109]. Posting of Nick Denton to Gawker, http://gawker.com/5009185/girl-flashes-google-mapmakers-cameras (May 15, 2008, 13:53 EST).

[FN110]. Google Street View Sightings, Thong Girl on Google Street View Sightings, http://www.gstreetsightings.com/girls/thong-girl-on-google-street-view-sightings/ (last visited Oct. 5, 2008).

[FN111]. Photobucket, http:// i28.photobucket.com/albums/c201/DIEmfDIE50/picker.jpg (last visited Oct. 5, 2008).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 40 of 59

49 Santa Clara L. Rev. 313

[FN112]. Posting of Philipp Lenssen to Google Blogoscoped, http:// blogo-scoped.com/archive/2007-06-03-n48.html (June 3, 2007).

[FN113]. Posting of Nick Denton to Gawker, http://gawker.com/5004469/a-drug-deal-caught-from-every-angle (Mar. 24, 2008, 13:32 EST).

[FN114]. Posting of Nick Douglas to Gawker, ht-tp://gawker.com/392059/google-maps-catches-chicago-kid-about-to-shoot-someone (May 20, 2008, 12:24 EST).

[FN115]. News.com.au, Gallery: The Best of Google Street View, http:// www.news.com.au/technology/gallery/0,25793,5031914-5007151-7,00.html.

[FN116]. News.com.au, Gallery: The Best of Google Street View, http:// www.news.com.au/technology/gallery/0,25793,5031914-5007151,00.html.

[FN117]. Posting of Stan Schroeder to Mashable, http:// mash-able.com/2007/05/31/top-15-google-street-view-sightings/ (May 31, 2007, 11:05 PDT).

[FN118]. Zusha Elinson, Boring Couple Sues Google over Street View, Law.com, Apr. 7, 2008, ht-tp://www.law.com/jsp/article.jsp?id=1207305794776.

[FN119]. Google: "Complete Privacy Does Not Exist," The Smoking Gun, July 30, 2008, ht-tp://www.thesmokinggun.com/archive/years/2008/0730081google1.html.

[FN120]. Solove, supra note 12, at 163; see also James Vlahos, Welcome to the Panopticon; High-Tech Surveil-lance Isn't Just for Secretive Government Agencies Anymore. Artificially Intelligent Cameras Will Soon Be Watching Us Almost Everywhere, from the Sidewalk to the Supermarket, Popular Mechanics, Jan. 2008, at 64, available at http:// www.popularmechanics.com/technology/military_law/4236865.html.

[FN121]. Solove, supra note 12 at 164; see also Agence France-Presse, NowPublic News Site Buys Truemors Rumor Website, Breitbart.com, July 10, 2008, ht-tp://www.breitbart.com/article.php?id=080710130330.p1rpxko5&show_ article=1.

[FN122]. Deborah Jian Lee, NYPD Calls on Citizens for Amateur Video Evidence, Reuters, July 31, 2008, ht-tp:// www.reuters.com/article/domesticnews/idUSN3136650420080731.

[FN123]. Posting of Charlie Sorrell to Wired Blog Network, http:// blog.wired.com/gadgets/2008/05/iphone-20-to-in.html (May 23, 2008, 4:44:24 PST).

[FN124]. Robert Weisman, Get Ready for Your Close-Up, Boston Globe, Dec. 11, 2007, at A1, available at ht-tp:// www.boston.com/business/technology/articles/2007/12/11/get_ready_for_your_ close_up/.

[FN125]. See Rafe Needlman, Sneak Peek: Earthmine's Street View, CNET News, June 26, 2007, ht-tp://www.webware.com/8301-1_109-9735721-2.html.

[FN126]. See Fla. Star v. B.J.F., 491 U.S. 524, 538 (1989).

[FN127]. See, e.g., Heath v. Playboy Enter's, Inc., 732 F. Supp. 1145, 1149 (S.D. Fla. 1990) ("What is news-worthy is primarily a function of the publisher, not the courts."); Clay Calvert, And You Call Yourself a Journal-

ist?: Wrestling with a Definition of "Journalist" in the Law, 103 Dick. L. Rev. 411, 437 (1999) (noting that judges applying the "Leave-it-to-the-Press Model" grant deference to the decisions of editors to determine what is newsworthy). But see Virgil v. Time, Inc., 527 F.2d 1122 (9th Cir. 1975) (imposing the high standard that news "ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake" based on the community's standards rather than adopting a leave-it-to-the-press approach); Sipple v. Chronicle Publ'g Co., 201 Cal. Rptr. 665, 670 (Ct. App. 1984) ("[T]he paramount test of newsworthiness is whether the matter is of legitimate public interest which in turn must be determined according to the community mores.").

[FN128]. See Jonathan Leake, Coming Soon: Superfast Internet, Times Online (London), Apr. 6, 2008, http:// www.timesonline.co.uk/tol/news/uk/science/article3689881.ece.

[FN129]. Steve Johnson, Street View: The Creepy Side of Google, Chicago Tribune, June 15, 2007, at 1.

[FN130]. Jonathan Richards, Google Could Be Superseded, Says Web Inventor, Times Online (London), Mar. 12, 2008, http:// technology.timesonline.co.uk/tol/news/tech_and_web/article3532832.ece.

[FN131]. Id.

[FN132]. Id.

[FN133]. See Rob Shaw, How Google Earth Ate Our Town, Time, Mar. 10, 2008, http://www.time.com/time/world/article/0,8599,1720932,00.html.

[FN134]. Id.

[FN135]. Id.

[FN136]. Posting of Stephen Shankland to CNET News Blog, http:// www.news.com/8301-10784_3-9913172-7.html?tag=nefd.top (Apr. 7, 2008, 13:22 PDT).

[FN137]. Posting of Elinor Mills to CNET News Blog, http:// www.news.com/8301-10784_3-9944572-7.html (May 14, 2008, 15:47 PDT).

[FN138]. Christine Evans-Pughe, Our Surveillance Society Goes Online, Guardian (London), May 8, 2008, at 3, available at http:// www.guardian.co.uk/technology/2008/may/08/privacy.internet ("When the [I]nternet goes fully semantic--and machines can read and understand all those scattered documents rather than just storing them--the potential for computers to define us, undermine our privacy and demarcate our freedom of action will be even greater.").

[FN139]. Caroline Daniel & Maija Palmer, Google's Goal: To Organise Your Daily Life, Fin. Times (London), May 22, 2007, at 1, available at http:// www.ft.com/cms/s/2/c3e49548-088e-11dc-b11e-000b5df10621.html; see also Rhys Blakely, Google to Tackle Wikipedia with New Knowledge Service, Times Online (London), Dec. 15, 2007, http:// business.timesonline.co.uk/tol/business/industry_ sectors/technology/article3054287.ece (reporting that soon Google will launch a new online encyclopedia which will aggregate information about every topic in the world, competing with Wikipedia); Weisman, supra note 124 ("As Google gets closer and closer to its stated goal of indexing all the world's information, more and more [privacy] issues arise.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN140]. Daniel & Palmer, supra note 139.

[FN141]. Posting of Stephen Shankland to CNET News Blog, http://news.cnet.com/8301-10784_3-9972034-7.html?tag=nefd.top (June 18, 2008, 12:31 PDT).

[FN142]. Daniel & Palmer, supra note 139; see also John Battelle, The Search: How Google and Its Rivals Rewrote The Rules of Business and Transformed Our Culture 252 (2005) ("As every engineer in the search field loves to tell you, search is at best 5 percent solved--we're not even in the double digitals of its potential.").

[FN143]. Daniel & Palmer, supra note 139.

[FN144]. Id.

[FN145]. See, e.g., Albert-László Barabási, Linked 164-65 (2002) (noting that Google only searches the outer layer of the Web, and the majority of content is still waiting to be discovered).

[FN146]. Posting of Stephen Shankland to CNET News Blog, http://news.cnet.com/8301-10784_3-9960259-7.html (June 5, 2008, 4:00 PDT). When asked about technology's ability to understand the contents of an image, Google's vice president in charge of search answered:
    The typical question people pose--'Can you tell that's a tree?'--I think that's the wrong question. We can tell that's a tree with the text [surrounding it]. We'll get you good pictures of trees. The problem is you want to look at the Hearst Building with the sign from the right angle with the sun up above. That's the kind of question that's very hard to tell, because the image doesn't say it's the Hearst Building and whether the sun is shining. You're getting into a lot of depth there. That's going to require some combination of some image processing and some information about it. The metadata around the image is going to get more important.
    Id.

[FN147]. http://picasa.google.com/support/bin/answer.py? answer=93973&topic=14605 (indicating that "[a]fter you enable name tags, Picasa Web Albums will look for similar faces in your photo collection" and tag them).

[FN148]. Id.; see also Harry Lewis, Op-Ed, How Facebook Spells the End of Privacy, Boston Globe, June 14, 2008, at A11, available at http://www.boston.com/bostonglobe/editorial_opinion/oped/articles/2008/06/14/how_ face-book_spells_the_end_of_privacy/ (editorializing that when Polar Rose is able to tag pictures on the Internet, people's personal information could wind up in "some great database").

[FN149]. Jonathan Richards, supra note 130.

[FN150]. Posting of Dan Farber to CNET News Blog, http://news.cnet.com/8301-10784_3-9982448-7.html?tag=nefd.riv (July 1, 2008, 14:58 EST).

[FN151]. Stephanie Clifford, Billboards that Look Back, N.Y. Times, May 31, 2008, at C1, available at http://www.nytimes.com/2008/05/31/business/media/31billboard.html?ref=opinion.

[FN152]. Id.

[FN153]. Id.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R   Document 36-3   Filed 02/08/10   Page 43 of 59

[FN154]. Id.

[FN155]. Daniel & Palmer, supra note 139.

[FN156]. Posting of Caroline McCarthy to CNET News Blog, http:// www.news.com/83 01-13577_3-9940166-36.html (May 9, 2008, 12:32 PDT).

[FN157]. Id.

[FN158]. Posting of Caroline McCarthy to CNET News Blog, http:// www.news.com/8301-13577_3-9939286-36.html (May 8, 2008, 10:04 PDT).

[FN159]. See Immersive Media, http://demos.immersivemedia.com/ (last visited Oct. 5, 2008).

[FN160]. Posting of Frank Taylor to Google Earth Blog, http:// gearthb-log.com/blog/archives/2007/05/technology_behind_go.html (May 31, 2007, 9:42).

[FN161]. Id.

[FN162]. See generally GEORGE ORWELL, 1984 (2d ed. 1982).

[FN163]. Fiona Macrae, Facial Scans Could Reveal Genetic Disorders, Daily Mail (London), Sept. 10, 2007, at 24, available at http:// www.dailymail.co.uk/pages/live/articles/health/healthmain.html?in_article_ id=480952&in_page_id=1774&in_a_source=.

[FN164]. Id. In another area of privacy concern, Google has begun aggregating people's health and medical records. Steve Lohr, Warning on Storage of Health Records, N.Y. Times, Apr. 17, 2008, at C1, available at ht-tp://www.nytimes.com/2008/04/17/business/17record.html?_ r=3&adxnnl=1&oref=slogin&ref=business&pagewanted=print&adxnnlx=1210707108-8q1ST4ZevSQFLmeztcid Yg.

[FN165]. Rachel Melz, Google Makes Health Service Publicly Available, Dallas Morning News, May 19, 2008, http:// www.dallasnews.com/sharedcontent/dws/bus/ptech/stories/05_21_ 08dnbusHealth.1059538d.html.

[FN166]. See Posting of Elinor Mills to CNET News Blog, http:// news.cnet.com/8301-10784_3-9957872-7.html?tag=nefd.top (June 2, 2008, 18:18 PDT) (discussing security vul-nerabilities on the Google web page).

[FN167]. See 1 William Blackstone, Commentaries on the Laws of England 130 (Univ. of Chicago Press 1979) (1765) ("The security of his reputation or good name from the arts of detraction and slander, are rights to which every man is intitled [sic], by reason and natural justice; since without these it is impossible to have the perfect enjoyment of any other advantage or right."); William Shakespeare, Othello act 2, sc. 3 ("Reputation, reputation, reputation! O, I have lost my reputation! I have lost the immortal part of my self and what remains is bestial.").

[FN168]. Solove, supra note 12, at 31 ("Our freedom, in short, depends upon how others in society judge us."); Daniel J. Solove, The Virtues of Knowing Less: Justifying Privacy Protections against Disclosure, 53 Duke L.J. 967, 1034 (2003).

[FN169]. Jeffrey Rosen, The Unwanted Gaze: The Destruction of Privacy in America 8-9 (2000) ("When intim-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

ate personal information circulates among a small group of people who know us well, its significance can be weighed against other aspects of our personality and character. By contrast, when initiate information is removed from its original context and revealed to strangers, we are vulnerable to being misjudged on the basis of our most embarrassing, and therefore most memorable tastes and preferences.").

[FN170]. Id.; Helen Nissenbaum, Privacy as Contextual Inquiry, 79 Wash. L. Rev. 119, 154-55 (2004) ("It is crucial to know the context--who is gathering the information, who is analyzing it, who is disseminating it and to whom, the nature of the information, the relationships among the parties, and even larger institutional and social circumstances.").

[FN171]. See Nissenbaum, supra note 170. See generally Editorial, Nothing Is Private, The Seattle Times, June 15, 2008, at B8, available at http:// seattle-times.nwsource.com/html/editorialsopinion/2004478298_porned15.html.

[FN172]. See Nissenbaum, supra note 170.

[FN173]. See id.

[FN174]. See id.

[FN175]. See Solove, supra note 12, at 74 ("The problem with Internet gossip is that it can so readily be untethered from its context."); Jennifer Lee, Trying to Elude the Google Grasp, N.Y. Times, July 25, 2002, at G1 ("The fragments of people's lives that emerge on the Internet are somewhat haphazard. They can be incomplete, out of context, misleading or simply wrong.").

[FN176]. Solove, supra note 168, at 993.

[FN177]. See Solove, supra note 12, at 67.

[FN178]. Id. at 70 ("People protect certain secrets because disclosure might lead to stereotyping and discrimination toward them and their families.").

[FN179]. See Solove, supra note 168, at 1034.

[FN180]. Bernhard Warner, How to Be UnGoogleable, Times Online (London), May 28, 2008, http://technology.timesonline.co.uk/tol/news/tech_and_web/the_ web/article4022374.ece ("Once your name gets into the search engine, removing all traces of yourself from the [I]nternet is next to impossible.").

[FN181]. See infra Part III.C.1.

[FN182]. Solove, supra note 12, at 38 ("Increasingly, information fragments about people on the Internet are used to make judgments about them.").

[FN183]. Id. at 1.

[FN184]. Id.

[FN185]. See id. at 2.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN186]. See id.

[FN187]. Id. at 1-3; see also Wikipedia, http:// en.wikipedia.org/wiki/Blog (last visited Oct. 6, 2008) (defining a blog as a short name for a web log, which is a running online commentary about one's personal thoughts and ob- servations).

[FN188]. Solove, supra note 12, at 2.

[FN189]. Id.

[FN190]. See id. ("We live in an age drenched in data, and the implications are both wonderful and terrifying."); Jonathan Krim, Subway Fracas Escalates into Test of Internet's Power to Shame, Wash. Post, July 7 2005, at D1 (quoting Howard Rheingold) ("The shadow side of the empowerment that comes with a billion and a half people being online is the surveillance aspect .... We used to worry about big brother--the state--but now of course it's our neighbors, or people on the subway.").

[FN191]. Solove, supra note 12, at 2.

[FN192]. Id.

[FN193]. Id. at 8, 11 ("The Internet is bringing back the scarlet letter in digital form--an indelible record of people's past misdeeds.").

[FN194]. Cmty. for Creative Non-Violence v. Watt, 703 F.2d 586, 622 (D.C. Circ. 1983), rev'd, 468 U.S. 288 (1984) (Scalia, J., dissenting). In his dissent, D.C. Circuit Judge Scalia acknowledged that "[t]he cases find with- in the First Amendment some protection for 'expressive conduct' apart from spoken and written thought." Id. Although he continued in strong disagreement with that view:

I start from the premise that when the Constitution said "speech" it meant speech and not all forms of expression. Otherwise, it would have been unnecessary to address "freedom of the press" separately--or, for that matter, "freedom of assembly," which was obviously directed at facilitating expression. The effect of the speech and press guarantees is to provide special protection against all laws that impinge upon spoken or written com- munication (which I will, for the sake of simplicity, refer to generically as "speech") even if they do so for pur- poses that have nothing to do with communication, such as the suppression of noise or the elimination of litter. But to extend equivalent protection against laws that affect actions which happen to be conducted for the pur- pose of "making a point" is to stretch the Constitution not only beyond its meaning but beyond reason, and bey- ond the capacity of any legal system to accommodate.

Id.

[FN195]. See Solove, supra note 12, at 38.

[FN196]. Editorial, supra note 171.

[FN197]. Mallory Simon, Dupre's MySpace Page Evolves with Scandal, CNN, Mar. 13, 2008, ht- tp://www.cnn.com/2008/US/03/13/ashley.myspace/index.html.

[FN198]. See Janet Kornblum, Social, Work Lives Collide on Networking Websites, USA Today, Jan. 18, 2008, at 1A, available at http:// www.usatoday.com/tech/webguide/internetlife/2008-01-17-social-network-nobarriers_N.htm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

49 Santa Clara L. Rev. 313

[FN199]. See infra Part III.D.2.c.

[FN200]. Posting of Tom Owad to Applefritter, http:// www.applefritter.com/bannedbooks (Jan. 4, 2006, 20:37).

[FN201]. See Solove, supra note 168, at 994, 1000.

[FN202]. Weisman, supra note 124.

[FN203]. Posting of Dan Farber to CNET News Blog, http://www.news.com/8301-13953_3-9941039-80.html?tag=nefd.riv (May 10, 2008, 6:13 PDT).

[FN204]. Jonathan Richards, Pentagon Bans Google from U.S. Bases, Times Online (London), Mar. 7, 2008, http:// technology.timesonline.co.uk/tol/news/tech_and_web/article3503624.ece.

[FN205]. Jonathan Leake, Google Earth Showed Protesters Way to Conquer Parliament, Times Online (London), Mar. 2, 2008, at 12, available at http:// www.timesonline.co.uk/tol/news/uk/article3458431.ece.

[FN206]. The Google Earth Gatecrashers Who Take Uninvited Dips in Homeowners' Swimming Pools, This Is London, June 18, 2008, http:// www.thisislondon.co.uk/news/article-23496124-details/The+Google+Earth+gatecrashers+who+take+uninvited+dips+in+home-owners% 27+swimming+pools/article.do.

[FN207]. Cf. Brendan Roberts, Google for a Murder Clue, Herald Sun (Austl.), Dec. 13, 2007, at 8, available at http:// www.news.com.au/story/0,23599,22916799-2,00.html?from=public_rss (reporting that the Google Street View surveillance vehicle may have recorded the identity of a suspect who dumped a body in an Australian town).

[FN208]. Posting of Stephen Shankland to CNET News Blog, http:// news.cnet.com/8301-1023_3-9996444-93.html?tag=nefd.top (July 22, 2008, 08:50 PDT).

[FN209]. See also Bryn Mickle, Your Name Here: City to Swap Ad Space for Camera Funds, The Flint Journal (Mich.), July 27, 2008, at A03, available at http://www.mlive.com/flintjournal/index.ssf/2008/07/flint_seeks_sponsors_for_ polic.html (reporting that "[t]he City of Flint [Michigan] is looking for sponsors for surveillance cameras that will be mounted around the city to keep a watch out for crooks. In exchange for cash, the city will plaster business names next to police logos on the pole-mounted camera boxes," although it is not known whether Google will participate in this sponsorship).

[FN210]. See Murphy, supra note 10, at 2388 (arguing that "as conceived by Warren and Brandeis, the tort of invasion of privacy is probably best described as alive, but on life support").

[FN211]. See, e.g., Kyllo v. United States, 533 U.S. 27, 40 (2001) ( "Where ... the Government uses a [new thermal imaging] device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant.").

[FN212]. Restatement (Second) of Torts § 652A cmt. a (1977).

[FN213]. Restatement (Second) of Torts § 652D cmt. d (1977).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN214]. Restatement (Second) of Torts § 652B cmt. c (1977).

[FN215]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (holding that the magazine is not liable for invasion of privacy tort for publishing a photograph of a couple embracing in public because the photo possesses social value and falls within the newsworthiness exception).

[FN216]. McNamara v. Freedom Newspapers, Inc., 802 S.W.2d 901, 903 (Tex. Ct. App. 1991) (holding that the newspaper is not liable for intrusion upon seclusion tort for reproducing a photograph of a soccer player with exposed genitals taken during a public soccer game because the event occurred in public).

[FN217]. Elinson, supra note 118.

[FN218]. Agence France-Presse, Google Blurs Faces in Street View Map Pictures, Breitbart, May 14, 2008, http://breitbart.com/print.php? id=080514214733.2n13nqsx&show_article=1.

[FN219]. Agence France-Presse, supra note 218.

[FN220]. Global Privacy Regime Needed, Google Privacy Chief Says, Washington Internet Daily, July 5, 2007, at Today's News.

[FN221]. District of Columbia v. Heller, 128 S. Ct. 2783, 2795 (2008) (Scalia, J.).

[FN222]. See supra Part II.C.

[FN223]. Agence France-Presse, supra note 218.

[FN224]. See Posting of Stephen Shankland to CNET News Blog, http:// news.cnet.com/8301-1023_3-10009394-93.html?tag=nefd.riv.

[FN225]. Elinson, supra note 118.

[FN226]. See John, supra note 102 and accompanying text.

[FN227]. Terry Pedwell, Google's New Street-Level View Concerns Privacy Commissioner, Globe and Mail (Can.), Sept. 12, 2007, at A7, available at http://www.cbc.ca/canada/story/2007/09/11/streetview-commissioner-privacy.html.

[FN228]. See infra Part III.D.

[FN229]. Posting of Eric Zeman to The Information Week Blog, http:// www.informationweek.com/blog/main/archives/2008/06/north_oaks_minn.html; jsessionid=XHXCCZX4RR4YYQSNDLPSKHSCJUNN2JVN?queryText=street+view (June 2, 2008, 09:50). See also Nathan Halverson, Google Claims Right to Post Photos from Private Land, Press Democrat.com, Aug. 21, 2008, http:// www.pressdemocrat.com/article/20080821/NEWS/10644/0/news07 (reporting that residents of Sonoma County, California complained that Google trespassed onto private property to record their town).

[FN230]. See supra Part I.C.

[FN231]. The Australian Law Reform Commission has recently proposed a privacy tort that closely mirrors the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tort developed in this article. See, e.g., Chris Merrit, Privacy Tort a Blow to Free Speech, The Australian, May 29, 2008, at 32, available at http:// www.theaustralian.news.com.au/story/0,25197,23774694-17044,00.html (reporting that the Australian Law Reform Commission proposed a privacy tort that mirrors the one proposed in this article, which applies when there is "a reasonable expectation of privacy and where the action that is the subject of the complaint is serious enough to cause substantial offence to an ordinary person"). See generally Australian Law Reform Commission, ALRC Discussion Paper 72 Review of Australian Privacy Law (2007), available at http:// www.austlii.edu.au/au/other/alrc/publications/dp/72/12.pdf.

[FN232]. Restatement (Second) of Torts § 652B (1977).

[FN233]. Restatement (Second) of Torts § 652D (1977).

[FN234]. Fla. Star v. B.J.F., 491 U.S. 524, 541 (1989) (holding that the publication of a rape victim's name does not violate her privacy because the information was available to the public and finding that the government could only regulate what a newspaper could publish in order to "further a state interest of the highest order").

[FN235]. McClurg, supra note 72, at 1055.

[FN236]. See Restatement (Second) of Torts § 652B cmt. c (1977); see also Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (Carter, J., dissenting) ("In effect, the majority holding means that anything anyone does outside of his own home is with consent to the publication thereof, because, under those circumstances he waives his right to privacy even though there is no news value in the event."); Cefalu v. Globe Newspaper Co., 391 N.E.2d 935, 939 (Mass. App. Ct. 1979) ("The appearance of a person in a public place necessarily involves doffing the cloak of privacy which the law protects.").

[FN237]. McClurg, supra note 72, at 1041.

[FN238]. Id.

[FN239]. Id. at 1055.

[FN240]. Sanders v. ABC, 978 P.2d 67, 71-72 (Cal. 1999) ("[N]either in Schulman nor in any other case have we stated that an expectation of privacy, in order to be reasonable for purposes of the intrusion tort, must be of absolute or complete privacy .... [P]rivacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic.").

[FN241]. Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); see also McClurg, supra note 73, at 1029.

[FN242]. Katz, 389 U.S. at 360 (Harlan, J., concurring).

[FN243]. See Olmstead v. United States, 277 U.S. 438, 464-65 (1928).

[FN244]. Katz, 389 U.S. at 360 (Harlan, J., concurring).

[FN245]. See Cal. Civ. Code § 1708.8(b) (Deering 2005).

[FN246]. See id.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R   Document 36-3   Filed 02/08/10   Page 49 of 59   Page 49

[FN247]. McClurg, supra note 72, at 1055.

[FN248]. See § 1708.8(b).

[FN249]. See id.

[FN250]. Sanders v. ABC, 978 P.2d 67, 72 (Cal. 1999) (citing 1 McCarthy, The Rights of Publicity and Privacy § 5.10 (1998)) ("There are degrees and nuances to societal recognition of our expectations of privacy .... Like 'privacy,' the concept of 'seclusion' is relative. The mere fact that a person can be seen by someone does not automatically mean that he or she can legally be forced to be subject to being seen by everyone.").

[FN251]. L.A. Police Chief Disses Proposed 'Britney Law,' CNN, Aug. 1, 2008, http://www.cnn.com/2008/CRIME/08/01/paparazzi.crackdown/index.html (named after oft-photographed celebrity Britney Spears); Jill Serjeant, L.A. Police Chief Says Paparazzi Law Unenforceable, Reuters, Apr. 8, 2008, http://              www.reuters.com/article/entertainmentNews/idUSN0836699420080408?              feed-Type=RSS&feedName=entertainmentNews&sp=true (named after Britney Spears, a frequent victim of paparazzi).

[FN252]. Ken Starr Helping Lawmakers Fight Paparazzi, CNN, June 10, 2008, http://www.cnn.com/2008/POLITICS/06/10/starr.paparazzi/index.html.

[FN253]. See generally David D. Kremenetsky, Insatiable "Up-Skirt" Voyeurs Force California Lawmakers to Expand Privacy Protection in Public Places, 31 McGeorge L. Rev. 285, 288 (2000).

[FN254]. Cal. Penal Code § 647(j) (Deering 2008).

[FN255]. Id.

[FN256]. Kremenetsky, supra note 253, at 288.

[FN257]. See Bill Rams, Cyber-Peeping: It's Growing, It's Frustrating, and It's Legal--Trend: Officials Say There's Nothing They Can Do to Stop Men from Filming up Skirts in Public Places, Orange County Reg., June 26, 1998, at A1 (reporting that men caught using video cameras to surreptitiously film up women's skirts and down their blouses); Bill Rams, Prosecuting Up-Skirt Videotaping May Be Uphill Battle, Orange County Reg., Aug. 27, 1998, at B2.

[FN258]. See, e.g., Kremenetsky, supra note 253, at 286 (observing that a man who slid a bag containing a camera under a woman's legs at Disneyland, another man who filmed down women's tops after getting off a ride at the Strawberry Festival, and a third man who filmed adult beachgoers with a camera concealed in a stereo were all able to escape liability under the previous Peeping Tom statute because the recordings occurred in public).

[FN259]. See Cal. Penal Code § 647(j)(2) (Deering 2008). Section 647 reads:
        Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: Any person who uses a concealed camcorder ... to secretly videotape ... another, identifiable person under or through the clothing being worn by that other person ... without the consent or knowledge of that other person, with the intent to arouse, appeal to or gratify the lust, passions, or sexual desires of that person and invade the privacy of that other person, under circumstances in which the other person has a reasonable expectation of privacy.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Id. (emphasis added).

[FN260]. See id.

[FN261]. Cal. S. Comm. on Public Safety, Analysis of AB 182, at 4 (1999).

[FN262]. See generally Aimee Jodoi Lum, Don't Smile, Your Image Has Just Been Recorded on a Camera-Phone: The Need for Privacy in the Public Sphere, 27 U. Haw. L. Rev. 377 (2004).

[FN263]. See, e.g., id. at 379.

[FN264]. Warren & Brandeis, supra note 19, at 210.

[FN265]. See 149 Cong. Rec. 15571 (2003) (statement of Sen. DeWine) ("The widespread availability of low-cost, high-resolution cameras has lead to an increase in the number of high-profile cases of ' **video-voyeurism**' all over our country. Reports of women being secretly videotaped through their clothing at shopping malls, amusement parks, and other public places are far too common.").

[FN266]. **Video Voyeurism** Prevention Act of 2004, Pub. L. No. 108-495, 118 Stat. 3999 (codified at 18 U.S.C. § 1801 (2004)).

[FN267]. Id.

[FN268]. For a statement on the usefulness of legislative history, see Antonin Scalia, A Matter of Interpretation 29-30 (1997) ("My view that the objective indication of the words, rather than the intent of the legislature, is what constitutes the law leads me, of course, to the conclusion that legislative history should not be used as an authoritative indication of a statute's meaning."). For a statement on one's reliance on legislative history, see Antonin Scalia & Bryan Garner, Making Your Case 49 (2008) ("Since most judges use legislative history, unless you know that the judge or panel [or law review article reader] before which you are appearing does not do so, you must use legislative history as well.").

[FN269]. 150 Cong. Rec. H7267 (2004) (statement of Sen. Sensenbrenner).

[FN270]. See, e.g., Haw. Rev. Stat. § 711-1111 (2004) (amended by 2004 Haw. Sess. Laws Act 83 (S.B. 2377) (eff. May 19, 2004)); see also Lum, supra note 262, at 398.

[FN271]. Wash. Rev. Code Ann. § 9A.44.115(2) (West 2000).

[FN272]. Id.; see also State v. Larson, No. 511696, 2003 WL 22766043, at *2 (Wash. Ct. App. Nov. 24, 2003) (citing Wash Rev. Code Ann. §9A.44.115(2)).

[FN273]. See supra note 236 and accompanying text.

[FN274]. See State v. Glas, 54 P.3d 147, 150-51 (Wash. 2002) (en banc) (holding that the state's voyeurism statute does not cover intrusions in a public location) (emphasis added); see also Lum, supra note 262, at 401-02.

[FN275]. See Lum, supra note 263, at 402 (discussing Wash Rev. Code Ann. § 9A.44.115(2)(b)).

[FN276]. La. Rev. Stat. Ann. § 14:283(A) (2004).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R    Document 36-3    Filed 02/08/10    Page 51 of 59

[FN277]. See id.

[FN278]. See, e.g., Kremenetsky, supra note 253, at 292.

[FN279]. Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

[FN280]. Restatement (Second) of Torts § 652D (1977); see also Shulman v. Group W Prods., Inc., 955 P.2d 469, 490 (Cal. 1998).

[FN281]. See, e.g., Anita L. Allen, Coercing Privacy, 40 Wm. & Mary L. Rev. 723, 737 (1999). The author pondered whether people expect anything to be private anymore based on modern culture, noting that:

Our parents may appear on the television shows of Oprah Winfrey or Jerry Springer to discuss incest, homosexuality, miscegenation, adultery, transvestitism, and cruelty in the family. Our adopted children may go on television to be reunited with their birth parents. Our law students may compete with their peers for a spot on the MTV program The Real World, and a chance to live with television cameras for months on end and be viewed by mass audiences.

Id.; see also Rosen, supra note 79, at 157 ("We expose details of our personal lives on talk shows and on the Internet, and we enjoy watching others expose themselves in a similarly exhibitionistic way on reality TV. Far from trying to master our fears, we wallow in them by watching TV shows like Fear Factor, where parti-cipants are forced to reenact their most dreaded anxieties; and we crave similar alarmism from cable TV news, which has become like a 24/7 version of a reality show, pandering fear as a form of voyeuristic entertainment.").

[FN282]. Tucker v. Merck & Co., No. Civ.A. 02-2421, 2003 WL 25592785, at *13 (E.D. Pa. May 2, 2003).

[FN283]. Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 248 (Pa. 2002).

[FN284]. See Shulman v. Group W Prods., Inc., 955 P.2d 469, 485-86 (Cal. 1998) (holding that videotaping gory images of a woman after she was severely wounded in a horrific car accident is not considered highly of-fensive).

[FN285]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (Carter, J., dissenting).

[FN286]. See Cal. Civ. Code § 1708.8(a) (Deering 2005) (emphasis added).

[FN287]. See infra Part III.D.

[FN288]. See Florida Star v. BJF, 491 U.S. 524 (1989) (White, J., dissenting) ("Florida wanted to prevent the widespread distribution of rape victim's names, and therefore enacted a statute tailored almost as precisely as possible to achieving that end."); see also McClurg, supra note 72, at 1057. In the context of obscenity law, see Stanley v. Georgia, 394 U.S. 557, 567 (1969) (noting that the general distribution of obscene materials is a great danger because it may "intrude upon the sensibilities or privacy of the general public.").

[FN289]. Restatement (Second) of Torts § 652B (1977).

[FN290]. Restatement (Second) of Torts § 652D (1977).

[FN291]. Id.

[FN292]. H.R. Rep. No. 108-504, at 2 (2004) ("The development of small, concealed cameras and cell phone

cameras, along with the instantaneous distribution capabilities of the Internet, have combined to create a threat to the privacy of unsuspecting adults, high school students, and children .... [These violations of privacy are] compounded when the pictures or photographs find their way to the Internet ...."); 149 Cong. Rec. 15571 (2003) (statement of Sen. DeWine) ("The impact of **video voyeurism** on its victims is greatly exacerbated by the Internet. As a result of Internet technology, the photographs that a voyeur captures can be disseminated to a worldwide audience in a matter of seconds. A State representative from Ohio, Representative Ed Jerse, stated it best when he told ABC News that when a woman's picture is posted on the Web, her privacy 'could be violated millions of times.'").

[FN293]. See supra note 268 for a discussion on the use of legislative history.

[FN294]. H.R. Rep. No. 108-504, at 2.

[FN295]. 149 Cong. Rec. 15571 (2003) (statement of Sen. DeWine).

[FN296]. Id.

[FN297]. La. Rev. Stat. Ann. § 14:283(A) (2004) ("**Video voyeurism** is ... [t]he transfer of an image obtained by activity described in Paragraph (1) of this Subsection by live or recorded telephone message, electronic mail, the Internet, or a commercial online service.").

[FN298]. See also Solove, supra note 12, at 11 ("From the dawn of time, people have gossiped, circulated rumors, and shamed others. These social practices are now moving over to the Internet, where they are taking on new dimensions. They transform from forgettable whispers within small local groups to a widespread and permanent chronicle of people's lives.").

[FN299]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (Carter, J., dissenting).

[FN300]. See Lior Jacob Strahilevitz, A Social Networks Theory of Privacy, 72 U. Chi. L. Rev. 919, 919 (2005).

[FN301]. Multimedia WMAZ, Inc. v. Kubach, 443 S.E.2d 491 (Ga. 1994).

[FN302]. Id. at 493.

[FN303]. Id.

[FN304]. Id.

[FN305]. Id. at 494.

[FN306]. See Strahilevitz, supra note 300, at 919.

[FN307]. Id.

[FN308]. Id.

[FN309]. Solove, supra note 12, at 179.

[FN310]. See generally Pinkerton v. United States, 328 U.S. 640, 646-47 (1946) (holding that when the finder of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

fact determines that the defendant is joined in a conspiracy, substantive crimes committed to advance that conspiracy can be charged to all defendants as long as they are still part of the conspiracy when those crimes are committed). Courts use Pinkerton to determine whether certain individuals were members of a conspiracy, when the individuals joined the conspiracy, and what their involvement was in certain activities with the group0. See, e.g., United States v. Aramony, 88 F.3d 1369 (4th Cir. 1996).

[FN311]. See Wikipedia, http://en.wikipedia.org/wiki/Viral_marketing (last visited Oct. 8, 2008) ("Viral marketing and viral advertising refer to marketing techniques that use pre-existing social networks to produce increases in brand awareness ... through self-replicating viral processes, analogous to the spread of pathological and computer viruses. It can be word-of-mouth delivered or enhanced by the network effects of the Internet. Viral marketing is a marketing phenomenon that facilitates and encourages people to pass along a marketing message voluntarily.     ");     see     also     MarketingTerms.com,     Viral     Marketing,     http://www.marketingterms.com/dictionary/viral_marketing/ (last visited Oct. 8, 2008). Viral Marketing is defined as a "[m]arketing phenomenon that facilitates and encourages people to pass along a marketing message." Id. "Viral marketing depends on a high pass-along rate from person to person. If a large percentage of recipients forward something to a large number of friends, the overall growth snowballs very quickly." Id.

[FN312]. See Solove, supra note 12, at 44-48 (recounting the history of the "Star Wars Kid" phenomenon). It is worth noting that the teenager, who did not intend anyone else to see the video, was so humiliated that he dropped out of high school and sought psychiatric care. Id. This is similar to the indignation that the "dog poop girl" also experienced, who also dropped out of her university. Id. at 2; see supra text accompanying notes 183-91. As a result of a single personal experience, taken out of context, and virally spread throughout the Internet, permanent damage is done to people's lives.

[FN313]. FKM P'ship v. Bd. of Regents of Univ. of Hous. Sys., 255 S.W.3d 619, 639 (Tex. 2008) (Willett, J., concurring     in     part,     dissenting     in     part),     available     at     http://www.supreme.courts.state.tx.us/historical/2008/jun/050661cd.htm

[FN314]. Solove, supra note 12, at 8 ("The dog poop girl would have just been a vague image in a few people's memories if it hadn't been for the photo entering cyberspace and spreading around faster than an epidemic.").

[FN315]. Id. at 2; see also Jonathan Richards, Google to Face Charges over Down's Syndrome Video, Times Online (London), July 25, 2008, http:// technology.timesonline.co.uk/tol/news/tech_and_web/article4397511.ece ("Italian prosecutors say a video which showed four youths taunting a teenager with Down's syndrome was an invasion of privacy.").

[FN316]. Daily Times Democrat v. Graham, 162 So. 2d 474, 476 (Ala. 1964).

[FN317]. See id. See also Bartnicki v. Vopper, 532 U.S. 514, 533 (2001) ("In considering that balance, we acknowledge that some intrusions on privacy are more offensive than others, and that the disclosure of the contents of a private conversation can be an even greater intrusion on privacy than the interception itself.").

[FN318]. See Solove, supra note 12, at 1; see supra Part II.D.1.

[FN319]. See id. at 2.

[FN320]. Id. at 94. People who are shamed online "[a]re unable to escape their past, which is forever etched into

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Google's memory." Id. "But a more nuanced view of privacy suggests that ... [the case of dog poop girl] involved taking an event that occurred in one context and significantly altering its nature--by making it permanent and widespread." Id. at 7. "The Internet, however, makes gossip a permanent reputational stain, one that never fades. It is available around the world, and with Google it can be readily found in less than a second." Id. at 33.

[FN321]. Florida Fire Chief in Hot Water over Photos of Topless Accident Victim, Fox News, Jan. 7, 2008, http:// www.foxnews.com/story/0,2933,320726,00.html.

[FN322]. Bartnicki v. Vopper, 532 U.S. 514 (2001) ("The normal method of deterring unlawful conduct is to punish the person engaging in it.").

[FN323]. See Multimedia WMAZ, Inc. v. Kubach, 443 S.E.2d 491 (Ga. 1994); see also text accompanying notes 301-05.

[FN324]. Solove, supra note 12, at 163 ("There is a difference between what is captured in the fading memories of only a few people and what is broadcast to a worldwide audience.").

[FN325]. See generally N.Y. Times v. Sullivan, 376 U.S. 254 (1964).

[FN326]. See Eugene Volokh, Symbolic Expression and the Original Meaning of the First Amendment, http://papers.ssrn.com/sol3/papers.cfm?abstract_ id=1267400 (last visited Oct. 26, 2008). See also Posting of Eugene Volokh to The Volokh Conspiracy, http://volokh.com/posts/1217533219.shtml (Aug. 1, 2008, 10:45) ("[T]he original understanding of the First Amendment, and also the traditional one in the centuries since the Framing, is that it does apply to civil litigation, though the exact scope of the constitutional rules has of course changed over time.").

[FN327]. See Lovell v. City of Griffin, 303 U.S. 444, 452 (1938).

[FN328]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (Carter, J., dissenting).

[FN329]. Restatement (Second) of Torts § 652D (1977).

[FN330]. Eugene Volokh, Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People from Speaking About You, 52 Stan. L. Rev. 1049, 1050-51 (2000); see also Prosser, supra note 37, at 423 (demonstrating that Dean Prosser looked at the privacy tort as creating "a power of censorship over what the public may be permitted to read"); Diane L. Zimmerman, Requiem for a Heavyweight: A Farewell to Warren and Brandeis' Privacy Tort, 68 Cornell. L. Rev. 291, 294, 362 (1983) (proposing that the public-disclosure tort should be "scuttled" because it has a chilling effect on the "free exchange of personal information"). But cf., Solove, supra note 13, at 12 ("If privacy is sacrificed at the altar of free speech, then some of the very goals justifying free speech might be undermined."). See generally Charles Fried, Modern Liberty and the Limits of Government 108 (2007) ("May government seek to assure that all speakers have the same opportunity to reach their audience--and that all audiences have an equal opportunity to hear what is available to some? The serious pursuit of equality would necessarily mean not just amplifying the voices of some of the volume and attractiveness of others, but turning down the volume of speakers who enjoy larger resources.").

[FN331]. See McClurg, supra note 73, at 1056.

[FN332]. Konigsberg v. State Bar of Cal., 366 U.S. 36, 56 (Black, J., dissenting).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN333]. See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985) ("We have long recognized that not all speech is of equal First Amendment importance."); Ohralik v. Ohio Star Bar Ass'n, 436 U.S. 447, 456 (1978) (finding that commercial speech is a "subordinate position in the scale of First Amendment values"); Cass R. Sunstein, Low Value Speech Revisited, 83 Nw. U. L. Rev. 555, 557 (1989) (arguing that protecting free speech depends on "making distinctions between low and high value speech, however difficult and unpleasant that task may be").

[FN334]. See, e.g., Branzburg v. Hayes, 408 U.S. 665 (1972) (holding that the freedom of the press guaranteed by the First Amendment does not exempt reporters from appearing and testifying before state or federal grand juries because of the importance of criminal trials); Solove, supra note 12, at 128.

[FN335]. Solove, supra note 12, at 126-28; Rolfs, supra note 72, at 1110.

[FN336]. See John H. Summers, What Happened to Sex Scandals? Politics and Peccadilloes, Jefferson to Kennedy, 87 J. Am. Hist. 825, 826 (2000).

[FN337]. Rolfs, supra note 71, at 1111.

[FN338]. Eldred v. Ashcroft, 537 U.S. 186, 190 (2003) (holding that enforcing copyright law is "compatible with free speech principles"). In addition, there are many intrinsic similarities between privacy and intellectual property law. See, e.g., Lawrence Lesssig, Privacy as Property, 69 Soc. Res. 247, 250 (2002) ("Just as the individual concerned about privacy wants to control who gets access to what and when, the copyright holder wants to control who gets access to what and when."); Warren & Brandeis, supra note 19, at 250 (drawing from copyright law to develop the right to privacy); Jonathan Zittrain, What the Publisher Can Teach the Patient: Intellectual Property and Privacy in an Era of Trusted Privication, 52 Stan. L. Rev. 1201, 1203, 1206-12 (2002) (noting the "profound relationship between those who wish to protect intellectual property and those who wish to protect privacy"). In the same way that authors of creative works seek control over their creations, people who want privacy strive to control how their image is used. There are obvious implications to Street View in the context of privacy as a form of intellectual property, wherein a person can control how their essence is used. Although the transaction costs to enforcing such a regime are quite high because of the ease of reproduction of a person's image, intellectual property law has found ways to solve similar problems. Cf. Solove, supra note 12 at 186 (stating that while he is not proposing that privacy should be traded and regulated in the same way patents or copyrights should, but rather "the law needs better ways to allow people to exercise control over their personal data," even if it is readily available to the public); Pamela Samuelson, Privacy as Intellectual Property?, 52 Stan L. Rev. 1125 (2000) (arguing that when companies acquire information from the commons, they gain the full benefit and fail to internalize the costs, and suggesting that this market failure could be remedied by granting individuals a property right to their personal data).

[FN339]. See, e.g., Machleder v. Diaz, 801 F.2d 46, 48 (2d Cir. 1986) (discussing the need to balance an individual's privacy rights against the rights of the press); Berg v. Minneapolis Star & Tribune Co., 79 F. Supp. 957, 960 (D. Minn. 1948) (discussing the need to balance press rights against a person's privacy rights); Barber v. Time, Inc., 159 S.W.2d 291, 295 (Mo. 1942) ("[E]stablishing conditions of liability for invasion of the right of privacy is a matter of harmonizing individual rights with community and social interests.").

[FN340]. See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-59 (1985).

[FN341]. Bartnicki v. Vopper, 532 U.S. 514, 516 (2001).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN342]. See Fla. Star v. B.J.F., 491 U.S. 524 (1989).

[FN343]. See, e.g., Whitney v. California, 274 U.S. 357 (1927) (Brandeis, J., concurring); Solove, supra note 12, at 129.

[FN344]. Fla. Star, 491 U.S. 524 (holding that the publication of a rape victim's name does not violate her privacy because the information was available to the public).

[FN345]. Id.

[FN346]. Id. at 542 (White, J., dissenting) (quoting Coker v. Georgia, 433 U.S. 584, 597 (1977)).

[FN347]. Id. at 550.

[FN348]. Smolla, supra note 71, at 1101.

[FN349]. Murphy, supra note 10, at 2388.

[FN350]. Rolfs, supra note 71, at 1128.

[FN351]. Fla. Star, 491 U.S. at 542-50 (White, J., dissenting).

[FN352]. Kapellas v. Kofman, 459 P.2d 912, 922-24 (Cal. 1969).

[FN353]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 447 (Cal. 1953) (Carter, J., dissenting).

[FN354]. Kapellas, 459 P.2d at 922.

[FN355]. Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

[FN356]. Solove, supra note 12, at 131.

[FN357]. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985) ("[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection' .... In contrast, speech on matters of purely private concern is of less First Amendment concern.").

[FN358]. Warren & Brandeis, supra note 19, at 196.

[FN359]. Solove, supra note 168, at 1003-08.

[FN360]. See Fla. Star v. B.J.F., 491 U.S. 524, 532 (1989); see also Cox Broad. Corp. v. Cohn, 420 U.S. 468, 491 (1974).

[FN361]. See Kimberly A. Dietel, Shadow on the Spotlight: The Right to Newsgather Versus the Right to Privacy, 33 Suffolk U. L. Rev. 131, 132 (1999).

[FN362]. Gertz v. Robert Welch, Inc., 418 U.S. 323, 369 (1974) (Brenan, J., dissenting). See also McClurg, supra note 72, at 1083-84.

[FN363]. See Schulman v. Group W Prods., Inc., 955 P.2d 469, 485-86 (Cal. 1998).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN364]. Virgil v. Time, Inc., 527 F.2d 1122, 1129 (9th Cir. 1975). Rather than adopting a "leave it to the press" approach, the court imposed a higher standard, holding:

      The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake with which a reasonable member of the public, with decent standards, would say that he had no concern.

Id.; see also Linda N. Woito & Patrick McNulty, The Privacy Disclosure Tort and the First Amendment: Should the Community Decide Newsworthiness?, 64 Iowa L. Rev. 185, 232 (1979).

[FN365]. Joseph Siprut, Privacy Through Anonymity: An Economic Argument for Expanding the Right of Privacy in Public Places, 33 Pepp. L. Rev. 311, 313-14 (2006).

[FN366]. Warren & Brandeis, supra note 19, at 216.

[FN367]. Id. at 214.

[FN368]. Solove, supra note 12, at 131.

[FN369]. See supra Part III.C.

[FN370]. Singel, supra note 94.

[FN371]. See Restatement (Second) of Torts § 652D (1977).

[FN372]. See Cal. Civ. Code Ann. § 1708.8(b) (Deering 2005).

[FN373]. See id.

[FN374]. § 1708.8(l).

[FN375]. Carlisle v. Fawcett Publ'ns, Inc., 20 Cal. Rptr. 405, 414 (Ct. App. 1962).

[FN376]. Warren & Brandeis, supra note 19, at 215-17.

[FN377]. Id. In the context of defamation law, see also Gertz v. Robert Welch, Inc. 418 U.S. 323, 345 (1974) ("[The plaintiff] has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery."); Time, Inc. v. Firestone, 424 U.S. 448 (1976).

[FN378]. See Fair Hous. Council v. Roommates.com, LLC, 489 F.3d 921, 921 n.1 (9th Cir. 2007).

[FN379]. Shulman v. Group W Prods., Inc., 955 P.2d 469, 485-86 (Cal. 1998). See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974) ("In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.").

[FN380]. Prosser, supra note 36, at 391-92.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:09-cr-01215-R   Document 36-3   Filed 02/08/10   Page 58 of 59

[FN381]. Restatement of Torts (Second) § 625D cmt. f (1977).

[FN382]. Prosser, supra note 36, at 391-92. It is also debatable whether Google should not be considered a tradi-
tional journalist because the ethical guidelines that have developed in the mainstream media which invariably
protect privacy have not yet developed on the Internet. Compare Summers, supra note 336, at 842 ("'[A] news-
paper should not invade private rights or feelings without sure warrant of public right as distinguished from pub-
lic curiosity."') with Solove, supra note 12, at 194 ("The mainstream media have established ethical guidelines
(albeit loose ones) to protect people's privacy, but the norms of the blogosphere [Internet media] are still in their
infancy."). However, the status of Internet entities as journalists is still to be resolved by the courts. See Blu-
menthal v. Drudge, 992 F. Supp. 44 (D.D.C. 1998) (White House employees brought defamation action against
an electronically-published gossip columnist and interactive computer service provider).

[FN383]. McClurg, supra note 72, at 1039.

[FN384]. Id. at 1040.

[FN385]. Gill v. Hearst Publ'g Co., 253 P.2d 441, 446 (Cal. 1953) (Carter, J., dissenting).

[FN386]. Galella v. Onassis, 353 F. Supp. 196, 228 (S.D.N.Y 1973), aff'd in part, rev'd in part, 487 F.2d 986 (2d
Cir. 1973) (quoting Nader v. General Motors Corp., 255 N.E. 2d 765, 771 (N.Y. 1970).

[FN387]. Restatement (Second) of Torts § 496D (1977).

[FN388]. McClurg, supra note 72, at 1040.

[FN389]. Restatement (Second) of Torts § 496D cmt. b (1977).

[FN390]. See, e.g., McClurg, supra note 72, at 1040.

[FN391]. See supra Part I.C.

[FN392]. See also Solove, supra note 12, at 120 ("If it is too easy to win a lawsuit, people will sue too readily,
causing people to refrain from engaging in candid robust speech for fear of being sued .... But without the threat
of lawsuits, online speakers have no legal incentive to remove posts or to resolve disputes informally.").

[FN393]. **Video Voyeurism** Prevention Act of 2004, Pub. L. No. 108-495, 118 Stat. 3999 (codified at 18 U.S.C.
§ 1801 (2004)).

[FN394]. See supra Part III.A.

[FN395]. See also Katz v. United States, 389 U.S. 347, 350-51 & n.7 (1967) (noting that in the criminal law
context, "[t]he right to be let alone by other people ... [is] left largely to the law of the individual States").

[FN396]. Robert G. McCloskey, The American Supreme Court 14 (1994) (noting that "public concurrence sets
an outer boundary for judicial policy making ... [and j]udicial ideas of the good society can never be too far re-
moved from the popular ideas").

[FN397]. See The Federalist No. 39 (James Madison) ("The proposed constitution, therefore, even when tested
by the rules laid down by its antagonists, is, in strictness, neither a national nor a federal constitution; but a com-

49 Santa Clara L. Rev. 313

position of both.").

[FN398]. In the context of defamation law, see Gertz v. Robert Welch, Inc., 418 U.S. 323, 347-48 (1974) ("We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach ... recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation."). See Spinozzi v. ITT Sheraton Corp., 174 F.3d 842, 845 (7th Cir. 1999) (Posner, J.) ("Most people affected whether as victims or as injurers by accidents and other injury-causing events are residents of the jurisdiction in which the event takes place. So if law can be assumed to be generally responsive to the values and preferences of the people who live in the community that formulated the law, the law of the place of the accident can be expected to reflect the values and preferences of the people most likely to be involved in accidents--can be expected, in other words, to be responsive and responsible law, law that internalizes the costs and benefits of the people affected by it.").

[FN399]. Miller v. California, 413 U.S. 15, 30, 32 (1973) ("To require a State to structure obscenity proceedings around evidence of a national 'community standard' would be an exercise in futility.... It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City. People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity.") (citations omitted).

[FN400]. See 1 William Blackstone, Commentaries on the Laws of England 69 (Univ. of Chicago Press 1979) (1765) ("But here a very natural, and very material, question arises: how are these customs or maxims [the Common Law] to be known, and by whom is their validity to be determined? The answer is, by the judges in the several courts of justice. They are the depository of the laws; the living oracles, who must decide in all cases of doubt, and who are bound by an oath to decide according to the law of the land. Their knowledge of that law is derived from experiences and study ... and from being long personally accustomed to the judicial decisions of their predecessors. And indeed these judicial decisions are the principal and most authoritative evidence, that can be given, of the existence of such a custom as shall form part of the common law.").

[FN401]. See Solove, supra note 12, at 123 ("The law should encourage websites to develop a process by which problems can be adjudicated and resolved, where bad information can quickly be taken down .... The law works best when it can hover as a threat in the background but allow problems to be worked out informally.").

[FN402]. Restatement (Second) of Torts § 46 (1977).

[FN403]. See Blumenthal v. Drudge, 992 F. Supp. 44, 53-57 (D.D.C. 1998).

[FN404]. See Bernstein v. Nat'l Broad. Co., 129 F. Supp. 817, 826 (D.D.C. 1955).

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.